363 P.2d 706

BIG LOST RIVER IRRIGATION DISTRICT, Plaintiff-Appellant,

v.

David Leland ZOLLINGER and Mrs. David Leland Zollinger, his wife, Defendants-Respondents.

No. 8920.

Supreme Court of Idaho.

July 10, 1961.

See, also, 364 P.2d 176.

Robert M. Kerr, Jr., Blackfoot, George L. Barnard, Idaho Falls, for appellant.

Anderson, Kaufman & Anderson, Boise, for respondents.

SMITH, Justice.

This is an eminent domain action commenced by appellant irrigation district, hereinafter called the district, to condemn an easement upon and over respondents' land for public use as a reservoir for storage of water for irrigation purposes. The trial court made a determination in favor of the district on the issue of public convenience and necessity and the district's entitlement to the easement, and entered judgment in favor of respondents for the value of the estate taken of $18,500, and severance damages of $26,500, from which judgment the district appealed.

The district owns Mackay Dam and Mackay Reservoir, used for the storage of water for irrigation purposes, situate in Custer County. The crest of the spillway of the dam was originally constructed at an elevation of 6,061.6 feet above sea level for impounding water in the reservoir. The dividing line between the land occupied by the reservoir and respondents' land, prior to this action, was fixed at the contour line of 6,062 feet elevation above sea level.

Some years prior to commencement of this action the district increased the elevation of its dam and spillway to a crest of 6,066.6 feet above sea level in order to create an estimated additional storage capacity of 6,000 acre feet of water. Resultant raises in elevation of water impounded in the reservoir caused additional flowage and erosion in and upon respondents' lands situate adjacent to the lands which the reservoir theretofore occupied.

The district, in order to acquire rights necessitated by this additional storage, commenced this action by filing its complaint, and causing summons to issue, June 27, 1958, to acquire a flowage easement upon respondents' lands above and adjacent to the reservoir, to the contour line of 6,066.6 feet, and of acquiring a freeboard easement for seepage, saturation and erosion, of an additional one foot in elevation, to the contour line of 6,067.6 feet above sea level.

Respondents, by answer, alleged their ownership, adjacent to the reservoir, of lands aggregating some 1197 acres together with grazing rights which, for some years and presently, constitute their ranch suitable for the production of crops and livestock; also that raising the flow line elevation of the reservoir to the contour line of 6,066.6 feet would cause erosion and destruction of their land lying adjacent to and above the contour level of the freeboard easement sought of 6,067.6 feet elevation above sea level.

Hearing held by the trial court on February 13, 1959, on certain preliminary issues resulted in an agreement, and stipula-

tion later filed, whereby the parties agreed that the court, in the trial of the case, should determine the area and estate, and value thereof, taken by the district, and the severance damages.

The trial court, May 13, 1959, determined the issue of public convenience and necessity in favor of the district. Pursuant to the agreement and stipulation, the court made appropriate findings, and entered intermediate judgment, adjudging that a flowage easement, up to the contour line of 6,066.6 feet, and a freeboard easement for seepage, saturation and erosion of lands above that contour elevation, to that of 6,070 feet above sea level, in and upon respondents' lands, were necessary for the storage of water in the district's reservoir; also that such constituted a public use of the lands most compatible with the greatest public good and the least private injury.

The court upon trial of the issues of value and damage, gave judgment August 31, 1959, adjudging that respondents recover from the district the value of the easements being condemned in the sum of $18,500, and severance damages in the sum of $26,500, together with interest and costs; and ordered that, upon payment of the judgment, the district shall be entitled to a final decree of condemnation in the premises.

The district, by its assignments of error on this appeal, presents no issue concerning the value of the easements, adjudged in the sum of $18,500. Rather, it presents the issues, whether the trial court properly adjudged condemnation of a freeboard area to the contour line of 6,070 feet above sea level; also, whether the court properly determined the severance damages.

Appellant district assigns error of the trial court in ruling that the condemnor—quoting appellant—"was required to condemn a freeboard area to the 6070 elevation line, when the condemnor sought and proposed a freeboard area to the 6067.6 elevation line, on the ground that the determination of the amount of freeboard is a function of the condemnor only, and is not a judicial function."

It is true that the district in its original complaint alleged it had raised the elevation of its dam to a contour flow level of approximately 6,066.6 feet, which would cause flow and seepage up to a contour level of 6,067.6 feet above sea level. However, respondents in their amended answer alleged, "that if the flow line elevation in Mackay Reservoir is raised to the alleged elevation of 6066.6 feet above sea level, all lands of defendants adjacent thereto and lying below an elevation of 6070 feet above set level will be damaged and destroyed by the waters in such reservoir." The parties, at the time of the preliminary hearing of February 13, 1959, after waiving

a jury, agreed that the trial court should find upon and settle this issue. That agreement, with relevant matter, reads:

"Mr. Anderson: * * * counsel here are going to stipulate in writing * * * that the Court in the course of this trial today and the further trial of the case will have the right to determine the area taken, the extent of the area being taken, the value, the severance damage irrespective of the allegations in the complaint and the amended answer. Further if the proof does not agree with the complaint and answer with respect to the extent of the area being taken the Court may make his own determination irrespective of the pleadings. Is that right?

"Mr. Kerr: Yes.

"The Court: That is my understanding.

"Mr. Kerr: The pleadings will be amended to correspond with the findings.

"Mr. Anderson: Well, whether amended or not the Court can make that determination.

"Mr. Kerr: That is correct.

"Mr. Anderson: We'll file a written stipulation on that. * * *.

"Mr. Kerr: That is correct.

*    *    *    *    *    *

"The Court: All right. * * * You may proceed."

On May 11, 1959, the parties filed the referred to stipulation which, among other things, provided:

"That irrespective of the pleadings in the above entitled cause, the court in the trial of such cause determine the area and estate being taken by the plaintiff, and the value of the area and estate being taken by the plaintiff, and the severance damages to the lands of the defendants described in the amended answer."

As a general rule stipulations of parties or counsel made in pending proceedings are conclusive as to all matters properly contained or included therein. Arnett v. Throop, 75 Idaho 331, 272 P.2d 308. The subject matters of the agreement and stipulation under consideration here, including determination by the court of the area of the freeboard taken and the necessity for its taking, appear well within the purview of applicable general rules. In Evans v. Raper, 185 Okl. 426, 93 P.2d 754, 755, it is stated:

"It is a well-settled proposition of law that litigants may stipulate concerning their respective rights involved in the case and are bound thereby where the agreements contained in the stipulation are not obtained through fraud, or not contrary to law or public

policy, and that the courts will enforce the same."

See also City of Los Angeles v. Cole, 28 Cal.2d 509, 170 P.2d 928. 83 C.J.S. Stipulations § 10a, p. 12, states the general rule:

"Any matter which involves the individual rights or obligations of the parties inter sese may properly be made the subject of a stipulation between them, provided the stipulation is not illegal, unreasonable, or against good morals or sound public policy, and does not interfere with the general powers, duties, and prerogatives of the court."

And at 83 C.J.S. Stipulations § 22, p. 46, appears the following rule applicable to stipulations relating to issues:

"The rules governing the construction and operation and effect of stipulations generally apply to stipulations with respect to the issues. Accordingly, the parties are bound by stipulations fixing the issues, * * *, and will not be permitted to depart therefrom."

We recognize the rule, urged by the district, that after judicial determination of the issue whether the condemnation is sought for public use, the question of the extent of the area of the land to be taken or affected, and the necessity for the taking should in a large measure be left to the judgment and discretion of the public agency, subject, however, to regulation and control by the courts. Idaho Const., Art. I, § 14; Washington Water Power Co. v. Waters, 19 Idaho 595, 115 P. 682; Boise City v. Boise City Development Co., 41 Idaho 294, 238 P. 1006. Analysis of the situation here will show that such rule is applicable to the procedure followed and determinations made herein. This is true, in the light of the agreement and stipulation of the parties which required the trial court to find and adjudge on the issue of the extent of the freeboard area to be taken and the necessity of the taking, whereupon, the district's pleadings were deemed amended accordingly. The district's assignment in this regard is without merit.

The district, by its second assignment, asserts error of the trial court in refusing the district's demands "to segregate the damages in the freeboard area, between the freeboard area sought by appellant and the additional area as determined to be required by the Court."

This assignment likewise has no merit obviously for the same reasons which negate the district's first assignment. For in the light of the procedure followed under the agreement and stipulation, the district is deemed to have sought the freeboard area "as determined to be required by the Court."

The district by its remaining assignment asserts error of the trial court in deter-

mining and assessing severance damages of $26,500, on grounds that the amount is excessive and not supported by the evidence. This assignment requires a review of the evidence in order to ascertain whether it is sufficient to support such amount of severance damages.

The record shows that periodic flooding by impounded waters in the district's reservoir will destroy vegetation suitable for livestock feed in the flowage area below the contour flow line of 6,066.6 feet above sea level, and reduce by at least 50% the feed and forage in the freeboard area to the contour line of 6,070 feet.

Respondent David L. Zollinger, in addition to testifying on his own behalf, called four neighborhood witnesses, Messrs. Donahue, Parsons, Pence and Alvin Zollinger, who for years, on their own cattle ranches, had followed cattle business and operations, similar to that of respondents. They were familiar with respondents' ranch and with ranch values in the area.

Those witnesses were in agreement with respondent Zollinger that on June 28, 1958, the date of the taking by the district, the value of respondents' ranch was approximately $200,000, and that the taking would reduce the value of the ranch by approximately $50,000; respondent Zollinger placed the reduction in value at $55,000.

Respondents also called three witnesses, Messrs. Christensen, Johnson and McDowell, who qualified as experts with regard to appraisals of cattle ranches and operations, and the values of property, and damage. Moreover, they were additionally qualified to determine the type and the value, and palatability for livestock consumption, of the plants and vegetation grown on respondents' ranch, and the damage which would ensue to the vegetation by flooding, seepage and erosion.

The district called two witnesses, Messrs. Grobert and Teples, real estate brokers, as experts.

A summary follows of the testimony of lay witnesses and of respondent Zollinger on the value of the ranch and the total damage, without a breakdown of the value of the easement taken and severance damage:

| Witness | Value at Date of Taking | Total Damage |
|---|---|---|
| Donahue | $ 185,000 to $200,000 | $ 50,000 |
| Parsons | $ 200,000 – a bargain | $ 50,000 |
| Pence | $ 200,000 | $ 50,000 |
| Alvin Zollinger | $ 200,000 – a good buy | $ 50,000 |
| David L. Zollinger (respondent) | $ 200,000 – at least | $ 55,000 |

Following is a summary of the expert witnesses who testified on behalf both of respondent Zollinger and the district:

| Witness | Value Before Taking | Value After Taking | Total Damage | Value of Land Taken | Severance Damage |
|---|---|---|---|---|---|
| Christensen | $ 151,200 | $ 101,955 | $ 59,245 | $ 35,000 | $ 14,245 |
| Johnson | 176,440 | 139,085 | 45,455 | 18,155 | 27,300 |
| McDowell | 182,265 | 133,380 | 48,885 | 18,985 | 29,900 |
| Groberg | 145,000 | 125,000 | 20,000 | 15,000 | 5,000 |
| Teples | 153,700 | 134,000 | 19,700 | 17,514 | 2,186 |

Respondents' ranch consists of 350 acres of wild hay meadow, 50 acres in alfalfa, 250 acres irrigated grass land, 250 acres of subirrigated grazing land, and 297 acres of dry grazing land, totaling approximately 1,197 acres. Additionally, the ranch has an appurtenant adjudicated water right of 950 miners inches of water and grazing rights on the public domain and forest reserve for 300 cows and bulls, and suckling calves, throughout the grazing season.

The total acreage of the easement, beyond the contour line of 6,062 feet, up to the contour line of 6,070 feet elevation above sea level, is 161 acres of which 92 acres will be actually flooded up to the contour line of 6,066.6 feet, the remaining 69 acres will be seeped, saturated and eroded beyond the contour line of 6,066.6 feet to the contour line of 6,070 feet.

The record, as it relates to respondents' ranch operations, shows that during the early spring through April the cows are calving; then the cows and calves are placed on the public domain during early May and then in the forest reserve; they remain there until the late fall, when they are returned to the ranch. The calves, returning as weaners, are fed and grazed on the ranch the ensuing winter and early spring, when they are either sold as yearlings or placed on leased pasture and later sold, depending upon the market. The calf crop each year exceeds 90%, placed conservatively at 250 yearlings annually.

Respondents also maintain 100 ewes on the ranch utilizing feed not consumed by the cattle. Respondents also pasture and feed requisite horses for such a ranch operation.

The carrying capacity of the operation is 585 animal units (4 head of sheep being an animal unit). The ranch's carrying capacity fits its livestock operation.

The ranch carries 300 head of cows and bulls, and approximately 250 suckling

calves, and in the winter carries the same number of cows and bulls, and the calves as weaners. During grazing season, while the cattle are on public domain and forest reserve, a crop of meadow hay and two crops of alfalfa are harvested. No hay is sold from the ranch. The grasses and vegetation on the ranch produce for fall and winter pasture. The pasture on the ranch from both pasture land and regrowth of the hay meadow is utilized through the late fall, winter and spring. The ranch affords excellent feed and forage for the livestock during the late fall, winter and spring. The fall and winter pastures on the ranch and climatic conditions in the vicinity are such that usually it is necessary to feed only one-half ton of hay per animal during the winter. The operation is considered economical.

The calves average 350 pounds each in the fall and as weaners put on 200 pounds per animal during the winter. In the spring when the cattle are turned onto the range, the weaners, then yearlings, are carried on the ranch for another month, or thereabouts, at which time respondents have the choice of selling them on the spring market, or putting them out on leased summer pasture for additional gain in weight for sale in the fall. Respondents never have had to buy hay ·for livestock, and have hay left over each spring, which is a desirable safety factor in a cattle operation. The meadow hay produced is considered top feed for livestock.

Respondents, because of the nature of their operation and the capacity of the ranch to carry its livestock, including the weaner calves, over the winter are in the advantageous position of having a choice when to market their cattle crop.

Respondents' expert witnesses considered the extent of the reduction, by the taking, in animal units of feed, the comparative animal carrying capacities of the ranch both before and after the taking, and the reduction in valuation because of reduction of the animal carrying capacity of the ranch, incident to the taking, as well as loss and partial loss of use of lands included in the easement area taken.

Respondents' expert witnesses were of the opinion that the taking will reduce the ranch's animal carrying capacity by 125 head of cattle, and the district's expert witnesses felt that the reduction would approximate 102 head of cattle.

The record further indicates, inasmuch as the ranch, after the taking, cannot carry 300 cows and bulls and the 250 calves over the summer and fall season, and 250 weaner calves over the winter, but can carry only 425 head of cattle, that respondents must reduce the calf crop, or sell the calves when they come off the range in the fall. The record further indicates by simple math-

ematical computation that such reduction will result in a loss of at least $7,000, and upwards to $10,000, of annual profits to respondents.

 In an eminent domain proceeding it is the mandatory duty of the court, jury or referee to assess the value of the property sought to be condemned, and if such property constitutes a part of a larger parcel, the damages which will accrue to the portion not sought to be condemned, by reason of the severance, and the construction of the improvement in the manner proposed by the condemnor, likewise must be ascertained and assessed. I.C., § 7–711; Hughes v. State, 80 Idaho 286, 328 P.2d 397; Idaho Const., Art. I, § 14.

The evidence is highly conflicting as it relates to the issue of serverance damages. We have briefly summarized sufficient of the testimony to show not only the aspect of conflict in the evidence, but to show that the evidence, though conflicting, is substantial and competent, and supports the findings of the trier of facts; under such circumstance this Court will not disturb the findings and the judgment based thereon. I.C., § 13–219; Manley v. MacFarland, 80 Idaho 312, 327 P.2d 758; White v. Ames Mining Company, 82 Idaho 71, 349 P.2d 550. This rule is applicable in an eminent domain proceeding. State ex rel. Rieb v. Sweet, 82 Idaho 191, 351 P.2d 230.

We therefore conclude that appellant's last assignment of error is not meritorious.

The judgment is affirmed. Costs to respondents.

TAYLOR, C. J., and KNUDSON, McQUADE and McFADDEN, JJ., concur.