394 P.2d 634

Nancy KORON, Plaintiff-Respondent,

v.

Jess H. MYERS, Defendant-Appellant.

No. 9323.

Supreme Court of Idaho.

Aug. 3, 1964.

Hardy C. Lyons, Sandpoint, for appellant.

Stephen Bistline, Sandpoint, and Thomas A. Mitchell, Coeur d'Alene, for respondent.

**570**

KNUDSON, Chief Justice.

During July, 1961, appellant (defendant), Jess H. Myers, a resident of Spokane County, Washington, acquired the Oasis Club, a tavern-restaurant property, located in Ponderay, Bonner County, Idaho. Sometime prior to January, 1962, appellant requested respondent (plaintiff) Nancy Koron, a licensed real estate broker, residing at Spokane, Washington, to procure a purchaser for said property. Subsequently respondent found a prospective buyer, one John R. Jones (hereinafter referred to as "Jones"), who, together with appellant, executed an "Earnest Money Receipt and Agreement" (hereinafter referred to as "agreement"), bearing date January 23, 1962, under the terms of which it is provided, inter alia, that the purchase price of the property is $17,-500; $4,000 as earnest money was paid to the broker, and the balance payable in installments. This agreement was prepared upon a printed form provided by respondent, the carbon copy of which contained the following provisions, all of which was printed except the names and title, date and percentage figure (10%):

### "AGREEMENT TO PAY COMMISSION

"I agree to pay forthwith to Nancy Koron, Realtor as a broker a commission of $ _10%_ and upon the closing or specific enforcement of this transaction said broker may apply on such commission the earnest money and/or purchase money paid to the extent of such commission. In the event of a forfeiture I agree that all forfeited payments shall be paid first to the broker to the amount of his regular commission and the balance to the seller as liquidated damages.

"Dated this _____ day of January, 1962. Seller   JESS MYERS
"Address: _____ Phone _____ Seller _____   "

Subsequent to the execution of the agreement the amount of the earnest money payment was, by mutual agreement of the parties, reduced to the sum of $2,500, which amount was retained by respondent.

On March 10, 1962, the Oasis Club was entirely destroyed by fire, the cause of which was not attributable to the fault or negligence of any of the parties here involved. This action was commenced by respondent, seeking to recover from appellant a brokerage commission in the sum of $1,-750. From a judgment in favor of respondent this appeal is taken.

Appellant assigns error to the court's finding that the sale and purchase transaction between Jones and appellant "hinged on the said Jones not being denied a liquor license." In considering this issue it is important to review the written stipulation of the parties and the record relating to the discussion had between attorneys for the respective parties during the preparation of the stipulation.

The language complained of is contained in paragraph (7) of the findings of fact, which provides:

"(7) Although not spelled out in the earnest money agreement, the entire transaction was hinged on the said Jones *not being denied a liquor license.*" (Emphasis supplied.)

For the purpose of comparison, we also quote paragraph (8) of the stipulation as follows:

"(8) Although not specifically spelled out in the agreements, Exhibits ⊥ and 2, the entire transaction was hinged on buyer Jones *obtaining a liquor license.*" (Emphasis supplied.)

The language used in each of said quoted paragraphs is so similar, except the last few words of each, that it is reasonable to conclude that such finding was intended to cover the statement contained in the above quoted stipulation, however it is apparent that it did not do so.

It is true that a part of the language complained of appears in paragraph (23) of the stipulation, wherein reference is made to a contract which had been prepared subsequent to the execution of the agreement, and it is therein stated that

"This [contract] was executed, but, as aforesaid, it was generally understood that the contract was defeasible, that is to say, in the event that Jones would be denied liquor license. It is necessary to show applicant's ownership (outright or on contract) or lease of the premises."

It is clear that the contract referred to in said quotation had been prepared and executed for the purpose of furnishing to the State some evidence (to accompany Jones' application for license) of Jones' contract right in the place of business sought to be licensed. However, the record shows that at the time the language to be used in said paragraph (23) of the stipulation was being considered before the court, the following discussion was had:

"MR. LYONS: That's pretty nearly true, Your Honor, but I don't like the word 'defeasible,' however, I am not going to argue about that.

"THE COURT: Wait a minute.

"MR. LYONS: There was no contract until Mr. Jones received the liquor

license, although, the contract necessarily has to be some form of a guise. I think you could use the word 'defeasible,' but with the stipulation that there would be no meeting of the minds unless he was issued a liquor license.

"MR. BISTLINE: There was a meeting of the minds, Hardy, but the idea of being like we conceded all along, if, for any reason, Jones would be denied a license, everybody would go back to their status quo. I think the word 'defeasible' covers it. What Hardy is saying there is, Jones couldn't apply for a license without a contract. At the same time, if he didn't get a license, then the contract was to be discarded. Wouldn't that be right?

"MR. LYONS: That's right.

"MR. BISTLINE: That's Hardy's theory, I think, that is the way the place was sold. That is agreed to, 23, as perhaps modified by anything Hardy and I have said."

In view of the statement of counsel that said paragraph (23) of the stipulation was to be *modified* to conform to the foregoing quoted discussion, it is clear that counsel intended the court to know it to be the understanding of the parties that "If he [Jones] didn't get a license, then the contract was to be discarded."

It was stipulated, and the court found, that the main business carried on at the Oasis Club was the sale of liquor-by-the-drink. At the time of the execution of the agreement Jones had not qualified as being entitled to a license in Idaho for the retail sale of liquor or beer. It is not contended by respondent that appellant's right to procure, and the actual procurement of such licenses, was not to play an important part in the consummation of the sale to Jones. In fact it was stated by the attorney for respondent that "the place has no value without a license."

The following quoted statements of counsel made during their discussion relating to paragraph (8) of the stipulation (hereinbefore quoted) are to the same effect, to-wit:

"MR. BISTLINE: $4000.00 was the right amount. That is agreed to. Number 7 is agreed to.

"Eight. This isn't anything in the writing, but Hardy and I, I think, are agreed on this. I have talked it over with my client and she agrees this is so. Although not specifically spelled out in the agreements, 1 and 2, this entire transaction involving this Oasis because it involves liquor-by-the-drink, was hinged on the buyer Jones getting a liquor license. Isn't that right?

"MR. LYONS: That is correct."

\*   \*   \*   \*   \*   \*

"MR. BISTLINE: In all fairness to Mr. Myers, who is Hardy's client, this is the way they are usually done. They didn't write it out in the contract, but over in Washington and here in Idaho and Oregon, where these licenses more or less have value now days and go with the place, the place has no value without a license. A deal like this it would be foolish for Mr. Jones to have paid $4000.00 down and then end up buying a place and not getting a license. It is generally understood in such an event the whole thing would be turned upside down and forgotten about. Isn't that right, Hardy?

"MR. LYONS: That is correct."

The parties having stipulated to a factual matter, the court should have followed the stipulation and adhered to the interpretation which was placed on the agreement by the parties themselves. As a general rule, stipulations of parties or counsel made in pending proceedings are conclusive as to all matters properly contained or included therein. Big Lost River Irrigation District v. Zollinger, 83 Idaho 401, 363 P.2d 706; Arnett v. Throop, 75 Idaho 331, 272 P.2d 308; 83 C.J.S. Stipulations § 13, p. 31.

Error is also assigned to the court's finding that "The said Jones was legally bound to purchase the property and the defendant obligated to sell it, and neither he, nor the defendant Myers, could unilaterally, as to each other, cancel said agreement because of the happening of the fire."

The sequence of events leading up to the time of the fire is not in dispute. On March 8, 1962, the county and village beer licenses for 1962 were transferred to Jones. On March 9, 1962, application by Jones for state liquor license was mailed to the department in Boise, and on the following morning, March 10, 1962, before the aforesaid application was acted upon or license issued, the Oasis Club was destroyed by fire.

The agreement executed by appellant and Jones discloses that the place of business, "Oasis Club," duly licensed to Jones, was the principal subject matter of that agreement and that neither party, either expressly or impliedly, made himself an insurer of the continued existence of said place of business until final consummation of the agreement. It is evident from the nature of said agreement that the parties contracted on the basis of the continued existence of such place of business and there is no contention that the fire was attributable to the fault or negligence of any of the parties involved. The property having been completely destroyed, it thereby became impossible to further perform the terms of the agreement.

The general rule applicable under such circumstances is stated in 17A C.J.S. Contracts § 466(1), page 628, as follows:

"In the absence of an express provision in the contract, where a contract relates to the use or possession of, or any dealing with, specific things, and the performance necessarily depends on the existence of the particular thing, the condition is implied by law that the impossibility arising from the perishing or destruction of the thing, or such impairment thereof as makes it unavailable, without fault in the party, shall excuse the performance, or terminate the agreement, because from the nature of the contract it is apparent that the parties contracted on the basis of the continued existence of the subject of the contract. * * *"

See also: 12 Am.Jur., Contracts, § 372, page 944.

A brief analysis of the rule is stated in Corbin on Contracts, Vol. 6, § 1337, pp. 388–389, wherein it is stated:

"There are many contracts in which the performance of one of the promises will be absolutely impossible in case of the destruction or non-existence of some specific thing. The parties both know this; but, in the happy-go-lucky fashion of mankind, they assume the thing's continued existence and express no intention as to what shall be done in case the thing is destroyed or non-existent. Either party may, of course, expressly or impliedly make himself an insurer, assume the risk, and promise indemnity in case of nonperformance. Either party can expressly make his own promise conditional on the continued existence of the thing. This is a matter of reasonable interpretation. But the court must find a solution, even in the cases where interpretation produces none."

" * * * In the absence of some expression of contrary intention the risk of destruction of a necessary specific thing, there being no fault, is borne by both parties. One whose promised performance is rendered objectively impossible by such destruction is discharged from his duty. Thus, the other party carries risk; he does not get the promised performance or the expected gain therefrom. On the other hand, he is discharged from his duty to pay the promised price of the performance that has become impossible; and if he has already paid it, in part or in full, he has a right to restitution. This not because his own performance has been impossible, it is because of 'failure of consideration,' because requiring the payment of something for nothing is repugnant to our

notions of justice. Thus, the first party also carries risk; he does not get his promised price or the expected gain therefrom. Both parties alike bear the risk of not getting the expected benefits of their bargain. The risk of property loss is on the owner of the thing destroyed; res perit domino. If one of the contracting parties is the owner, his misfortune is the greater."

In the case of Texas Company v. Hogarth Shipping Corporation, 256 U.S. 619, 41 S.Ct. 612, 65 L.Ed. 1123, the court, speaking through Mr. Justice Van Devanter, said:

"It long has been settled in the English courts and in those of this country, federal and state, that where parties enter into a contract on the assumption that some particular thing essential to its performance will continue to exist and be available for the purpose and neither agrees to be responsible for its continued existence and availability the contract must be regarded as subject to an implied condition that, if before the time for performance and without the default of either party the particular thing ceases to exist or be available for the purpose, the contract shall be dissolved and the parties excused from performing it. [Citing many cases.]"

In Tulsa Opera House Co. v. Mitchell, 1933, 165 Okl. 61, 24 P.2d 997, an opera building was totally destroyed by fire before the performance of a contract involving a transfer of the capital stock to third persons, and it was held that destruction of the building discharged each party from further liability under the contract.

The legal principle which is here applicable is also set forth in Parrish v. Stratton Cripple Creek Mining & D. Co., 10 Cir., 116 F.2d 207; Johnson v. Atkins, 53 Cal. App.2d 430, 127 P.2d 1027; La Cumbre Golf & Country Club v. Santa Barbara Hotel Co., 1928, 205 Cal. 422, 271 P. 476.

By reason of the destruction of the property the rule of law hereinbefore announced discharged each of the parties from further liability under the terms of the agreement. It is notable that both parties to the agreement here involved recognized the impossibility of performance and mutually abandoned the agreement and authorized a return to Jones of the earnest money he had paid. The conclusion reached by the trial court, complained of by appellant, was clearly error.

Respondent commenced this action seeking to recover from appellant a realtor's commission as a result of procuring a purchaser of appellant's property hereinbefore referred to. The only allegations relating to such contract are contained in para-

graphs III and V of her complaint, which are as follows:

"III

"In such capacity plaintiff was engaged by the defendant JESS H. MYERS to procure a purchaser for certain real and personal property which the said defendant claimed to own within the State of Idaho and the County of Bonner."

"V.

"In accepting the sale the defendant, MYERS agreed to a commission payable to the plaintiff in the sum of $1750.00."

The only portion of the stipulation which makes reference to the form and terms of her claimed contract is paragraph (6) thereof, which provides:

"(6) The defendant agreed to pay the plaintiff a 10 percent commission amounting to $1,750.00, as shows by said Exhibit 2, stipulated into evidence."

The only finding that the trial court made which throws any light upon the agreement claimed by respondent is the following:

"(5) The defendant Myers agreed to the terms of the said sale, and signed the agreement already signed by Jones. The defendant Myers in so doing, executed his agreement to pay the plaintiff a commission of 10 percent of the sales

price, which commission amounted to the sum of $1,750.00."

and a portion of paragraph (4) of its conclusions of law, which states:

" * * * Her right to a commission was established when she obtained the defendant's signature to the earnest money agreement, * * *"

In view of this condition of the record it must be assumed that the respondent relies upon the "Agreement to Pay Commission," hereinbefore quoted. The court's finding that respondent was entitled to her claimed commission being based on documentary evidence, which finding is claimed as error, this court will examine and weigh the evidence the same as if the case were being tried de novo, and determine the facts from the record. Hale v. McCammon Ditch Co., 72 Idaho 478, 244 P.2d 151; Burns v. Skogstad, 69 Idaho 227, 206 P.2d 765; Saccomano v. North Idaho Shingle Co., 73 Idaho 284, 252 P.2d 518; Poesy v. Closson, 84 Idaho 549, 374 P.2d 710.

The agreement being the only written indication as to the nature of respondent's employment as a broker, and since its language does not leave it free from doubt as to the intention of the parties, it must be construed. The only written agreement existing between the appellant and respondent is on a printed form and we shall follow

the permissible aid to interpretation that "[w]hether or not a limitation, condition or proviso in a contract is one precedent, subsequent, or a mere covenant is not to be determined alone by any technical language used, but primarily by the intention of the parties as evidenced by the transaction and the language used." Cozby v. Edwards (Tex.Civ.App., 1947), 203 S.W.2d 569.

When a broker is employed to make or effect a sale of property, as distinguished from employment to procure a purchaser, he is not entitled to a commission until a valid and enforceable contract is procured or until a sale is completed. 12 Am.Jr.2d, Brokers, § 193, page 935. It is also recognized that where parties agree that the agent's right to compensation shall depend upon certain contingencies or conditions precedent, an agent cannot recover compensation for his services unless all such conditions have been performed or fulfilled. Campbell v. Cove Ranch Land, etc., Co., 28 Idaho 445, 155 P. 662.

Under the terms of the commission agreement appellant agreed to pay to respondent as a broker "a commission of $ 10% and upon the closing or specific enforcement of this transaction said broker may apply on such commission the earnest money and/or purchase money paid to the extent of such commission." Considering said language in conjunction with respond-

ent's allegation, that she, as a broker, was engaged by appellant to procure a purchaser indicates that respondent was not employed merely to procure a buyer, but was obligated to accomplish and close a sale by an enforceable contract concerning which specific performance could be had. This construction is supported by the unrefuted testimony of appellant as follows:

"Q This is your signature at the bottom of the Exhibit, you agreed to 10 per cent for Mrs. Koron getting this buyer Jones for you?

"A That is my signature.

"Q You agreed to the commission of 10 per cent?

"A Provided it was consummated."

No doubt the erroneous finding and conclusion reached by the trial court that notwithstanding the fact that Jones did not secure a liquor license and that the subject of the contract had been destroyed by fire, Jones was legally bound to purchase the property, was the controlling basis for awarding judgment to respondent. We conclude that under the facts and circumstances here involved, the judgment is reversed and the cause remanded with instruction to enter judgment for appellant. Costs to appellant.

McQUADE, McFADDEN, TAYLOR and SMITH, JJ., concur.