690 P.2d 927

**FIRST SECURITY BANK OF IDAHO, N.A., a corporation, Plaintiff/Respondent,**

v.

**Mark HANSEN and Janet Hansen, husband and wife, Defendants/Appellants/Cross-Respondents,**

and

**Flyer's, Inc., an Idaho corporation and Hansen Ranch, Inc., an Idaho corporation, Defendants/Respondents/Cross-Appellants.**

**Mark HANSEN, and Mark Hansen as Personal Representative of the estate of Janet F. Hansen, deceased, Plaintiffs/Appellants/Cross-Respondents,**

v.

**FLYER'S, INC., an Idaho corporation; Hansen Ranch, Inc., an Idaho corporation; Earl C. Barnard and Kathryn Barnard, husband and wife; Peter Hodgkinson, individually; Floyd R. Caldwell; and Floyd R. Caldwell, Jr., Defendants/Respondents/Cross-Appellants.**

**Nos. 15188, 15202.**

Supreme Court of Idaho.

Nov. 8, 1984.

474

Henry F. McQuade (argued), and R.H. Young, Nampa, for defendants/appellants/cross-respondents.

Stanley W. Welsh, Boise, for defendants/respondents/cross-appellants Flyers, Inc., and Hansen Ranch, Inc.

No appearance by plaintiff/respondent First Security Bank.

BISTLINE, Justice.

## HISTORY

In September, 1977, plaintiffs Hansens, in an attempt to retire, sold their ranch on contract to defendant Flyer's, Inc. The purchase price of $850,000 included all real property, improvements and most of the personal property, to be paid in annual installments. The principals of Flyer's, Inc. personally guaranteed the contract. At the signing of the contract, Hansens received $150,000, which, other than some payments made by defendants on existing mortgages, is the sole consideration received to date. Extended legal proceedings then took place. Sometime in 1983 Hansens regained possession of the ranch, which was in poor condition and without cattle herds or crops. Most of the machinery was missing, while some was present in a damaged condition. In addition, Hansen (his wife, Janet Hansen, has since died) is attempting in other lawsuits to quiet title and settle related matters between himself and various third parties.

Procedurally, as noted by the district court, this case "began in confusion and has progressed accordingly." After Flyer's failed to adhere to certain terms in the contract, Hansen sent them notice of default in February of 1979. In December of 1979, after changing attorneys, Hansen filed a complaint, seeking to rescind or reform the contract and to recover for the alleged conversion of some cattle and hay which he claims were not included in the sale. First Security Bank, the escrowholder, filed an interpleader action in March, 1980, as a disinterested stakeholder, requesting interpretation of the notice of default. On November 30, 1981, in response to a motion by plaintiffs, the action filed by First Security Bank was consolidated with the Hansen v. Flyer's case. In addition, District Judge Kramer at this time ordered that all checks held in escrow (amounting to $70,000) by First Security Bank be immediately cashed. On January 6, 1982, the Hansens filed a Motion to Compel Perform-

ance as, by that time, the checks had been presented for payment and had been dishonored and returned by the bank on which drawn. The Hansens requested the court to compel the defendants to pay $70,000 to the escrow holder or to be found in contempt of the earlier order.

On January 11, 1982, the parties appeared in court pursuant to the Motion to Compel Performance, and at that time the parties, through counsel, stated that the case had been settled, and that the original contract in the case was going to be rewritten. The parties then stipulated on the record as to most of the terms of the new agreement and were to return to court shortly after the new agreement was signed in order that the trial court could then dismiss the action. However, the parties were thereafter unable to agree upon all of the terms of the new contract: specifically, the parties disagreed as to whether the Hansens were to convey a particular 320-acre tract of land to the Buyers upon execution of the contract and payment of the $75,000, whether the execution of the contract by Mrs. Janet Hansen, in view of her mental incapacity, was to be by an officer of the court or one of the parties; and whether the new contract included a provision from the addendum of the old contract personally guaranteeing the purchase price by the individual members of Flyer's, Inc.

On February 11, 1982, the Buyers filed a Motion to Compel the Hansens to sign the contract and to deed the 320 acres to them for the $75,000. At that hearing it became known to the court that Janet Hansen was mentally incompetent and presently residing in a care center in Salt Lake City, Utah.

On March 18, 1982, the trial judge issued a Memorandum Opinion determining the effect of the stipulation of January 11, 1982. In its opinion, the trial court stated that, by their stipulation, it was clear that the parties intended that the addendum to the original contract would remain intact as to its provision that the contract would be guaranteed personally by the officers and stockholders of the defendant corporations. In addition, the trial court stated that the deed to the 320-acre parcel would be held in escrow as per the original agreement. And finally, the trial court stated that, because parties are bound by the stipulations of counsel and, at the time such stipulations were made, nothing was indicated in the record concerning the alleged incompetence of Janet Hansen, Mark Hansen would be ordered by the court to sign the agreement on behalf of both himself and his wife. The terms of the stipulation resulted in a June 29, 1982, judgment interpreting the stipulated settlement. Flyer's made no payments under the reformed agreement, and Hansen sent to Flyer's another notice of default.

On October 4, 1982, the Hansens moved for a Temporary Restraining Order and preliminary injunction restraining Flyer's from removing machinery from the ranch and ordering a return of all personal property. On November 1, 1982, the trial court granted the temporary restraining order and set a hearing on the preliminary injunction. At the hearing, Flyer's argued that it was the owner of the machinery, introducing as evidence a bill of sale executed September 2, 1977. Following the hearing, the trial court issued an injunctive order on November 13, 1982, restraining defendants from removing certain personal property and requiring the return of other personalty; it declared void the September 2, 1977, bill of sale. Later it ordered the First Security Bank to return to Mark Hansen certain documents held in escrow.

Thereafter, pursuant to the trial court's earlier orders the Hansens moved for an Order to Compel Performance or have judgment for reasonable value of the property not returned. In turn, Flyer's Inc., and Hansen Ranch, Inc.,[1] filed a motion to have the trial court declare those orders void.

---

1. Although the contract under consideration was originally consummated between Flyer's, Inc., and the Hansens, Flyer's, Inc., subsequently assigned its interest to Hansen Ranch, Inc. Thus, both corporations are joined as defendants by the plaintiffs-appellants Hansens.

The trial court subsequently heard argument on these motions, as well as a new motion by plaintiffs to hold defendants in contempt. Apparently Hansen had regained possession of the ranch by this time, although the record does not state when or how it was accomplished. Flyer's argued that the temporary restraining order and the preliminary injunction were void for lack of jurisdiction and procedural defects. Then, Hansen moved to amend his complaint to allege conversion of additional cattle and a horse, and to seek cancellation of the contract, and general and punitive damages.

On August 1, 1983, the district court issued its Final Memorandum Opinion and Order which is the subject of this appeal. Hansen's motion to amend the complaint was denied. Damages for the failure of Flyer's to return the machinery was denied based on a finding that there was no proof of value. The court also denied Flyer's motion to void the temporary restraining order and the preliminary injunction, ruling that Flyer's had waived any defects in jurisdiction or procedure by ignoring the injunction and by failing to object until seven months later. The court further held Flyer's in contempt and assessed a $500 fine. The court held that any additional relief sought by Hansen for damages would have to be brought in an independent action for breach of the reformed contract. Both parties have appealed.

## I.

■ The Hansens' first contention, that an automatic forfeiture of the first contract occurred following uncured notice of default, does not withstand scrutiny. The contract terms specifically gave the Hansens the right to declare a default, true, but here the Hansens did not so avail themselves, but thereafter, indulging in the default and the failure to comply with a 60-day notice, and after changing attorneys, brought suit to rescind or reform the contract. The filing of the lawsuit resulted in an open-court stipulation to enter into a reformed contract which we have noted

above was enforced by the trial court. Clearly, the Hansens elected not to stand on their right to declare a forfeiture, and at the filing of their complaint recognized the continuing existence of the contract.

## II.

Appellants next contend that the trial court erred in ordering Mark Hansen to sign the amended contract for his wife, Janet Hansen. Appellants argue that, because Janet Hansen was allegedly incompetent at the time the revised contract was signed, and was not represented by a guardian *ad litem* or conservator of her estate, the agreement was invalid and should be declared void *ab initio*. The district court, however, refused to void the agreement on this basis, stating the following:

"The Court is concerned with the fact that Mrs. Hansen 'is not in physical or mental condition to execute any deeds or agreements.' Parties are bound by the stipulations of counsel. Nothing in the record indicates that Mrs. Hansen was mentally incapacitated at the time of the employment of Mr. Jack Murphy who acted as counsel for the Hansens at the time of the stipulation in open court. Therefore, since Mrs. Hansen cannot execute an amended agreement, the proper solution in this matter is for judgment to be entered upon the stipulation with the judgment to include a recitation of the stipulation and all the terms of the original agreement not effected by the stipulation."

Memorandum Opinion, March 13, 1982, R., p. 71.

We find no vitality to the Hansens' claim of error based on the alleged mental incompetence of Mrs. Hansen, and the trial court's resolution of that problem. Mrs. Hansen had entered into the initial contract at a time when her competence was not challenged. Following that she and her husband elected to not forfeit that contract, but sought its reformation or rescission. And, as noted by Judge Kramer in a written decision, at the time of the in-court

stipulation, "nothing indicates that Mrs. Hansen was mentally incapacitated ...."

 Mrs. Hansen presumably was capable of authorizing her attorney and her husband to deal on her behalf. *Carron v. Guido*, 54 Idaho 494, 33 P.2d 345 (1934). Once having entered into a binding contract, the transaction was not thereby nullified by Mrs. Hansen's intervening incapacity. It has been well-stated that: "Before an adjudication of insanity, the acts of the agent within the scope of the authority he appears to possess are binding upon the principal, notwithstanding his insanity, as to such third persons as deal with the agent in ignorance of the continuing authority." 2A C.J.S. *Agency* at 762. Only after Mr. Hansen became disenchanted with the terms of the new agreement he had made was he heard to raise the issue of his wife's condition. After inducing the trial court and the other parties to the contract to rely both upon his apparent authority through counsel to enter into such an agreement (and implicitly his wife's ability to do so in her own right), he cannot be heard thereafter to urge the existence of facts he had previously kept to himself. *See, e.g., Idaho Title Co. v. American States Insurance Co.*, 96 Idaho 465, 531 P.2d 227 (1975); *KTVB, Inc. v. Boise City*, 94 Idaho 279, 486 P.2d 992 (1971); *McCormick & Co., Bankers v. Tolmie Bros.*, 42 Idaho 1, 243 P. 355 (1926); *Mahoney v. Marshall*, 3 Idaho 484, 31 P. 809 (1892). *See also Loomis v. Church*, 76 Idaho 87, 277 P.2d 561 (1954). We accordingly see no error here on the part of the trial court.

### III.

Appellant also contests the trial court's treatment of certain stipulations entered into by the parties in open court on January 11, 1982. The stipulations were made with regard to a modified contract to which the parties had agreed and which they were going to execute a few days later. The stipulations are best evaluated by looking to the very words of counsel and their clients:

[Mr. Shaw for Flyers'; Mr. Murphy for the Hansens; and Mr. Hobdey for the Bank.]

"THE COURT: Would you gentlemen like to state for the record what the settlement is?

"MR. SHAW: Yes, I will attempt to do so, and Mr. Murphy, correct me if I am wrong.

"Your Honor, first of all the original contract in this case is going to be rewritten for a total figure of $1,020,000 which will include principal and interest to date.

"The new contract will be executed on Friday of this week at which time $75,-000 down will be paid. An additional $35,000 will be paid in six months from the execution of the contract which $35,-000 will bear ten percent.

"On the balance of $1,020,000 less the $75,000 and the $35,000 will commence February 1, 1982, and will be at seven percent.

"Annual payments will be made in the sum of $100,000 per year including interest payable on the first day of February, the first payment due 1983.

"The contract will be paid in full on the 15th year—I haven't figured out what the 15th year is yet. 1997, I think.

"MR. MURPHY: That's what my figures show.

"MR. SHAW: We will be eliminating the addendum to the existing contract and basically rewriting a new contract.

"The new contract will contain some additional provisions, one of which is, although there is a 60 day note default notice provision in the contract, when the 60 day notice has been given if at—it will bear, of course, the payment would bear seven percent interest, but if it's not paid within the first 30 days of that default period and is paid sometime in the second 30 days of the default period, the interest on the payment would be 12 percent, Your Honor, so it's basically seven percent on the payment for the first 30 days, then it goes up to 12 percent on the payment for the next 30 days.

"There will be a provision in the contract which provides that the contract cannot be assigned without the express written consent of the seller provided, however, the seller shall not unreasonably withhold his consent.

"We are going to put some time limits on that, Your Honor, that that consent, either consent or refusal, must be given within 30 days upon receipt of notice that we intend to assign the contract.

"We are also going to put a provision in the contract which the buyers may or may not choose to utilize, that in the event the seller does not give his consent, that we have the right to pursue as to whether the consent was legitimately withheld under arbitration under the laws of the State of Idaho under our arbitration statute, which decision we have agreed upon providing the contract must be rendered within 30 days it's submitted arbitration.

"The contract will be written in the name of Hansen Ranch, Inc., as the buyer.

"THE COURT: Buyer or seller?

"MR. SHAW: As the buyer, Your Honor. That's one of the party defendants in this case at the present time.

"Each party in this case is to bear his own costs and Attorney's fees and this stipulation fully disposes and settles all the claims and counterclaims of the parties to this action, Your Honor.

"THE COURT: Do you so stipulate?

"MR. MURPHY: Yes, Your Honor.

"THE COURT: Mr. Hansen, you have heard the terms of this and do you agree with this stipulation?

"MR. MARK HANSEN: I will agree with it.

"THE COURT: Do you have a client here?

"MR. SHAW: Yes, Your Honor, I have Mr. Barnard who is president—

"MR. EARL BARNARD: President of Hansen Ranch, Inc.

"THE COURT: Mr. Barnard, do you agree with this stipulation?

"MR. EARL BARNARD: I do, sir.

"THE COURT: Thank you. And I understand—Mr. Hobdey is here and incidentally, let the record show that both Mr. Murphy and Mr. Shaw are here, and Mr. Hobdey is here representing First Security Bank. And I would suspect that First Security Bank would have a right to make application for some attorney's fees or costs, but I understand they are willing to waive that right, is that correct?

"MR. HOBDEY: That's correct, Your Honor.

"THE COURT: All right. Then I take it in view of the stipulation and in view of Mr. Hobdey's comments that this case is fully disposed of and can be dismissed with prejudice upon the execution of the stipulation that has taken place, is that correct?

"MR. MURPHY: That's correct.

"MR. SHAW: That's correct, Your Honor.

"MR. HOBDEY: Both cases, I take it?

"THE COURT: Yes, both cases as consolidated. Gentlemen, as soon as those—that contract, rewritten contract is executed, who wants to prepare the Order dismissing this case, these cases?

"MR. SHAW: I will prepare the Order dismissing the cases, Your Honor. Your Honor, is there any need in light of the small time element to actually have a signed stipulation since we are having a contract executed on Friday?

"THE COURT: I would not think it necessary to have a signed stipulation. We have it in the record now. We have the parties agreeing that this is the stipulation."

Tr., pp. 3–7.

Shortly after the stipulations were made, however, a disagreement arose and the Hansens refused to sign the agreement which was drawn to effectuate the stipulation. The buyers then moved to compel compliance. That motion and the response thereto isolated the new bone of contention.

All that was in dispute was whether the in-court stipulation had called for the delivery of a deed to 320 acres with title insurance by Mark Hansen and whether the stipulation called for the release of certain guarantors as listed in an addendum to the original agreement. In answering both questions in the negative, the trial court determined the intent of the parties by looking to their earlier agreement, the controversy which had arisen, and the stipulation.

"Even if one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." J. Calamari and J. Perillo, *Contracts* at 52. *See also Southwest Eng'r Co. v. Martin Tractor Co.*, 205 Kan. 684, 473 P.2d 18 (1970); *Luis Hirsch y Cia., S.A. v. Rosenblatt Casing Co.*, 418 F.2d 1300 (2d Cir.1969); *Euclid Eng'r Co. v. Illinois Power Co.*, 79 Ill.App.2d 145, 223 N.E.2d 409 (1967). That the parties intended to continue with their transaction is a matter of court record—their intentions in this regard were stipulated to the court, and on the record. It is uncontroverted and well established that such stipulations may be enforced:

> "The parties having stipulated to a factual matter, the court should have followed the stipulation and adhered to the interpretation which was placed on the agreement by the parties themselves. As a general rule, stipulations of parties or counsel made in pending proceedings are conclusive as to all matters properly contained or included therein."
>
> *Koron v. Myers*, 87 Idaho 567, 573, 394 P.2d 634, 637–38 (1964).

*See also Kershaw v. Pierce Cattle Co.*, 87 Idaho 323, 393 P.2d 31 (1964). In addition, the parties by so declaring the terms to which they had agreed, and not stating that there were any provisions of their initial agreement which had yet to be resolved, implicitly were declaring that the resolved problems had been and were the only defects or changes needing to be rectified or made by a modified contract. Therefore, there did indeed exist a "reasonably certain basis for giving an appropriate remedy"—in this case, implying as fixed all of those terms initially agreed upon by the parties in their executed original contract, which terms were not disputed by the parties at the time the above stipulations were entered into. Accordingly, we hold that the district court committed no error in enforcing the stipulations of change in the contract to which the parties had formally bound themselves.

### IV.

And, finally, the Hansens contend that the trial court erred in denying a motion to amend the complaint so as to include an action in conversion for the value of livestock and property allegedly removed from the ranch by defendants. The trial court, in denying this motion, stated the following:

> "The parties are bound by the terms of the reformed contract. If there is a breach of that contract, an independent suit sounding in breach should be initiated. The evidence on file, including the testimony of Mark Hansen which failed to establish other than nominal value for the disputed personal property, cannot form a basis for any award of damages. And the Court will not entertain further proceedings in an attempt to establish value. That, if it is to occur at all, must occur in another action."
>
> Memorandum Opinion and Order, R., p. 145.

Rule 15(a), dealing with amended and supplemented pleadings, states the following:

> "A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within twenty (20) days after it is served. *Otherwise a party may amend his pleading only by leave of court or by written*

*consent of the adverse party; and leave shall be freely given when justice so requires, and the court may make such order for the payment of costs as it deems proper.* A party shall plead in response to an amended pleading within the time remaining for response to the original pleading or within ten (10) days after service of the amended pleading, whichever period may be the longer, unless the court otherwise orders." (Emphasis added.)

Past cases have clearly demonstrated the large degree of discretion of the trial court in this area. *Compare Andrus v. Irick,* 87 Idaho 471, 394 P.2d 304 (1964), with *Vollmer Clearwater Co. v. Union Whse. & Supply Co.,* 43 Idaho 37, 248 P. 865 (1926). In addition, it has long been held that unless the Court's exercise of its discretion to permit amendment deprives the complaining party of some substantial right, it is not error. *Radermacher v. Eckert,* 63 Idaho 531, 123 P.2d 426 (1942). In the present case, the trial court specifically suggested the availability of a separate and independent action for either breach of the amended contract or conversion of the appellant's property, as might be deemed appropriate. We agree with the trial court that the conclusion of the present action in no way acts as a bar to any future action—either on the contract or otherwise—arising out of the present transaction.

We therefore affirm the trial court's treatment of the issues raised by appellant on appeal.

## V.

Respondents' [cross-appellants'] issue on the cross-appeal is that the trial court erred in its finding them in contempt of court. They contend, *inter alia,* that the contempt proceedings were invalid because the trial court lacked jurisdiction in the matter. It is argued, in this regard, that jurisdiction was lacking because the affidavit alleging such contempt to have occurred was insufficient for failure to allege either actual or constructive notice of the proceedings as to the respondents, and because the orders which were allegedly ignored by respondents were issued without the necessary jurisdiction. Therefore, it is urged, no contempt citation could properly issue.

The trial court, in its August 1, 1983 Memorandum Opinion, gave extensive treatment to its finding that the defendants were guilty of contempt under I.C. § 7–601. The trial court based its contempt finding on I.C. § 7–601(5), which states the following:

"7–601. **Contempts defined.**—The following acts or omissions in respect to a court of justice, or proceedings therein, are contempts of the authority of the court:

. . . .

"(5) Disobedience of any lawful judgment, order or process of the court."

However, before any contempt committed outside of the court's presence may be punished, the requirements of I.C. § 7–603 must first be met. I.C. § 7–603 states the following:

"**Contempt in presence of court—Punishment.**—When a contempt is committed in the immediate view and presence of the court, or judge at chambers, it may be punished summarily; . . . . *When the contempt is not committed in the immediate view and presence of the court, or judge at chambers, an affidavit shall be presented to the court or judge of the facts constituting the contempt,* or a statement of the facts by the referees or arbitrators, or other judicial officer." (Emphasis added.)

With regard to this requirement, the trial court summarily stated the following:

"It is the opinion of the Court that the affidavit and testimony of Mark Hansen present in this action suffice to meet the requirements of § 7–603 to permit the Court to punish for a contempt committed out of the Court's presence. The only question remaining to be answered before punishment might issue is whether the order which has been disobeyed by the defendants is lawful."

Memorandum Opinion and Order, August 1, 1983, R., p. 141.

 We disagree with the district court. Citing this Court's decisions in *Jones v. Jones,* 91 Idaho 578, 428 P.2d 497 (1967), and *Bandelin v. Quinlan,* 94 Idaho 858, 499 P.2d 557 (1972), cross-respondents correctly state that the "initiating affidavit must allege that the contemnor or his attorney was served with the order which he is charged as having violated ..., or that he had actual knowledge of it." *Jones, supra,* 91 Idaho at 581, 428 P.2d 497. In considering the affidavit, "Since contempt proceedings are quasi-criminal in nature, even though designed to impose punishment for violation of an order made in a civil action, no intendments or presumptions may be indulged to aid the sufficiency of the affidavit." *Jones, supra; Bandelin, supra,* 94 Idaho at 861, 499 P.2d 557. In the present case, a close reading of the affidavit submitted by Mark Hansen reveals no allegation to the effect that the Temporary Restraining Order and preliminary injunction were served on the defendants. "Where the affidavit fails to allege all essential material facts, however, such deficiencies cannot be cured by proof supplied at the hearing, *Phillips v. Superior Court,* supra. [22 Cal.2d 256, 137 P.2d 838 (1943)]; *Frowley v. Superior Court,* 158 Cal. 220, 110 P. 817 (1910), or by judicial notice of the court's own records. *State v. Lenske,* [243 Or. 477, 405 P.2d 510 (1965)]." *Jones, supra,* 91 Idaho at 581, 428 P.2d 497. Therefore, because the affidavit forming the basis for the trial court's finding of contempt was insufficient, the trial court lacked jurisdiction to make such a finding and its order of contempt and attendant fine must be reversed.

The judgment of the trial court is affirmed in its totality other than the order which was entered finding the respondents in contempt. That order is reversed and set aside.

No costs awarded, and no attorney's fees awarded.

DONALDSON, C.J., and HUNTLEY, J., concur.

BAKES, J., concurs in the result.

SHEPARD, J., sat but did not participate.