544 P.2d 314

**Dwayne BLANKENSHIP and Beulah Blankenship, husband and wife, Plaintiffs-Appellants,**

v.

**Robert MYERS et al., Defendants-Respondents.**

**No. 10857.**

Supreme Court of Idaho.

Dec. 30, 1975.

---

358

Stephen Bistline, Sandpoint, Thomas Malott, Spokane, Wash., for plaintiffs-appellants.

James E. Hunt, Sandpoint, Paul S. White, Spokane, Wash., for defendants-respondents.

BAKES, Justice.

This is an action to set aside a conveyance as in fraud of creditors, or in the alternative to assert a vendor's lien against certain real property which was conveyed by plaintiff-appellants Dwayne and Beulah Blankenship to Roy C. Myers, Sr., and his son and daughter-in-law Robert and Nellie Myers, the defendant-respondents herein. A summary of the relevant facts of this rather convoluted transaction follows:

The plaintiff appellants Dwayne and Beulah Blankenship, husband and wife, originally were the owners of the property in question, a farm along the Kootenai River in Boundary County, Idaho, herein referred to as the Bonners Ferry ranch. In August of 1956 the Blankenships agreed to sell their equity in the ranch to Roy C. Myers, Sr., and Robert and Nellie Myers. The purchase price for the property was purportedly to be a ranch owned by the two Myerses in the state of Washington, referred to as the Moses-Coulee property. However, the Blankenships maintained throughout the action, and the evidence tends to support their contention that the real estate agent who was handling the transaction, a Mr. Al Patrick, had represented to the Blankenships that there was a contract of sale already in effect on the Moses-Coulee property, and that what the Blankenships were really buying was a vendor's interest in the contract of sale of the Moses-Coulee property, the proceeds of which they could use to acquire the Vic Weitz ranch in Washington which they were really interested in purchasing. The Blankenships denied that they ever agreed to accept the Moses-Coulee property in exchange for their Bonners Ferry ranch. However, the original documentation represented the transaction to be a trade of the two ranches.

Blankenships finally determined that the Moses-Coulee property was not sold and it is questionable whether there ever was a contract of sale on it, this apparently being one of numerous fraudulent statements made by the real estate salesman Patrick. Thereafter, Patrick made certain other representations to both parties that a loan could be obtained on the Moses-Coulee property to provide the Blankenships with the cash necessary to acquire the Vic Weitz ranch in the state of Washington, the property which they were really interested in acquiring. When that loan never materialized and the Blankenships made their dissatisfaction known to Roy C. Myers, Sr., in October of 1956, he agreed to an alternate transaction with the Blankenships. The alternate agreement called for Roy C. Myers, Sr., to pay the Blankenships $105,000 in contracts and cash in place of the Moses-Coulee property, and the Blankenships returned the deeds which the Myerses had executed to them on the Moses-Coulee property. However, when Roy C. Myers, Sr., turned the $105,000 in contracts and cash over to the real estate salesman Patrick, he converted $50,000 worth of those documents and the Blankenships never received the full $105,000. However, in view of Patrick's activities it was not until much later that the parties realized that Patrick had converted those assets. The details of how Patrick concealed his conversion, and his subsequent dealings with the Moses-Coulee property

were brought to light in the litigation subsequently conducted in the state of Washington which will be mentioned later.

After acquiring the Bonners Ferry property in August of 1956, Roy C. Myers, Sr., experienced several adverse financial transactions the net effect of which was that in 1959 he transferred nearly all his remaining assets to his children, who in return assumed approximately $100,000 of his liabilities. On April 7, 1959, Roy C. Myers, Sr., deeded his three-fourths interest in the Bonners Ferry ranch to his son Robert by a quitclaim deed, which was not recorded until July 1, 1959. This is the transfer which the Blankenships contend was in fraud of creditors. On July 17, 1959, Roy C. Myers, Sr., initiated a quiet title action to the Moses-Coulee property in the state of Washington, joining the Blankenships as defendants.[1] In that quiet title action the Blankenships counterclaimed for the $50,000, which they had never received pursuant to the alternate transaction involving the sale of the Bonners Ferry property, and judgment was entered in favor of the Blankenships against Roy C. Myers, Sr., on November 27, 1961, on their counterclaim for the $50,000 which they had never received as a result of Patrick's conversion. The Blankenships also obtained a $50,000 judgment against Patrick, but have been unable to collect it because Patrick, who was then serving a life sentence in a federal penitentiary, apparently is impecunious.

The Blankenships have never been able to satisfy their judgment against Roy C. Myers, Sr., because he is now also apparently insolvent, and this action was instituted on April 6, 1962, in the district court in Boundary County, Idaho, to set aside the 1959 transfer of Roy C. Myers, Sr.'s, interest in the Bonners Ferry ranch as in fraud of creditors, or, in the alternative, to assert a vendor's lien against the Bonners Ferry property for the balance that the Myerses allegedly owed on the purchase price.

The trial court rejected both of the Blankenships' claims against the Bonners Ferry property and entered judgment denying the Blankenships' claim that the transfer from Roy C. Myers, Sr., to Robert and Nellie Myers was in fraud of creditors, and denying the Blankenships a vendor's lien on the Bonners Ferry property. The Blankenships have appealed from that judgment. Robert and Nellie Myers are the respondents herein, Roy C. Myers, Sr., not being a party to this appeal. We reverse.

## THE FRAUDULENT CONVEYANCE ISSUES

Central to the issue of whether or not the transfer by Roy C. Myers, Sr., of his three-fourths interest in the Bonners Ferry ranch on April 7, 1959, was a transfer in fraud of his creditors is an evaluation of the consideration which Robert Myers gave for his father's three-fourths interest, and

---

1. The Blankenships were made defendants in that quiet title action because they were once the record holders of a mortgage on the Moses-Coulee property which had been given to them by Patrick as a result of other loans and debts which Patrick owed them. Apparently sometime after Blankenships had returned the deeds to the Moses-Coulee property to Roy C. Myers, Sr., Patrick had fraudulently induced Myers to transfer the Moses-Coulee property to Seaboard Industries, Inc., a corporation wholly owned by Patrick, who then placed several mortgages against it for loans and other indebtedness which he had incurred. One of these mortgages was the mortgage executed to the Blankenships, which

was the reason for their being joined in the quiet title action which Myers filed on the Moses-Coulee property. The conveyance of the Moses-Coulee property to Seaboard Industries, Inc., was apparently voided and set aside for fraud in yet another action between Roy C. Myers, Sr., and Patrick and Seaboard Industries, Inc., which had been filed in Spokane County, Washington. All of these transactions put together by Patrick may have accounted for the fact that the parties never realized that he had converted the $50,000.00 worth of contracts and other securities which Myers had delivered to him for payment to Blankenships, until sometime in 1959.

the value which the trial court placed upon that three-fourths interest. The trial court made the following findings of fact pertaining to that issue.

"XIII.

"The defendants [Robert and Nellie Myers] in exchange for that deed of April 7, 1959, from Roy Myers assigned and transferred to Roy Myers a contract of the value of $68,000.00, cancelled debts due defendants from Roy Myers in the sum of $18,767.00 and assumed the indebtedness against the property upon the following values:

Value of property on April
7, 1959 ............... $371,000.00

Indebtedness against prop-
erty .................. 245,208.00
_____
Value ranch on April 7,
1959 ................. $125,792.00

¾ interest Roy Myers .... $ 94,344.00

That Roy Meyers received for a fractional three-fourths interest mathematically computed at $94,344.00, the sum of $86,767.00, being a fair value therefor.

"XIV.

"There is no evidence before the Court to establish clear and convincingly that the transaction involved rendered Roy Myers insolvent or that he was not in fact solvent on the 7th day of April, 1959." (Clk. Tr., p. 63).

Blankenships have assigned these findings as error, and further have assigned as er-

ror the refusal of the trial court to consider as substantive evidence the depositions of Roy C. Myers, Sr., and Robert Myers.

The trial of this matter was held in November, 1969, and the pretrial depositions of Roy C. Myers, Sr., and Robert Myers were taken in 1962, three years after the transfer in question. During the course of those depositions, both Myerses made certain statements which appellants contend were admissions concerning the value of the Bonners Ferry property, and of the value of Roy C. Myers, Sr.'s, interest in it at the time it was transferred and that these admissions tended to place a substantially higher value upon the Bonners Ferry ranch and Roy C. Myers, Sr.'s, interest in it than the trial court placed on the ranch and his interest in finding of fact XIII. At the trial the Blankenships offered into evidence the depositions of Robert Myers and Roy C. Myers, Sr., as substantive proof of the facts contained in the admissions made by those witnesses at the deposition. However, the trial court refused to admit those depositions as substantive evidence, ruling that under the Idaho Rules of Civil Procedure[2] the deposition of a party opponent could not be used as substantive evidence if the party was available to testify. Both Roy C. Myers, Sr., who was then 89 years old and whose memory was faltering, and Robert Myers were present at the time of trial, and therefore the trial court refused to admit the depositions for any purpose other than impeachment and the refreshing of a witness's memory.[3]

2. This, and all other references to the Idaho Rules of Civil Procedure in this case, refer to the rules which went into effect on November 1, 1958, in effect on November 3, 1969, the date of trial, rather than the revision of the rules adopted effective January 1, 1975. The old rule regarding the use of depositions in trial was I.R.C.P. 26; the new rule is I.R.C.P. 32.

3. The record reflects that at the very opening of the case the attorney for Blankenships sought the admission of portions of the deposition of Robert Myers stating: [after objection to its admission on the ground that Robert Myers was present in court and available to be called as an adverse witness]

"MR. BISTLINE: But I don't plan to call him to impeach, I am going under the part of the rules which states that the deposition of a party is admissible for all purposes. These would be similar to out-of-court admissions except these are of a higher nature because they are taken in the course of this litigation, they are sworn statements and sworn admissions and statements against interest in here that we believe under the rule we are entitled to put in as direct evidence in the case.

"THE COURT: This has come up in Judge Towles' court. He doesn't feel that the rule reads that, Judge Cogswell does think so. I have held in two or three previous cases that the necessary foundation

We believe the trial court erred in refusing to consider the depositions of Robert Myers and Roy C. Myers, Sr., as substantive evidence for the following reasons. First, the depositions arguably contained admissions of a party opponent, and this Court has long allowed the introduction of admissions of a party opponent into evidence, in most cases under circumstances in which the reporting of the party opponent's statement is not nearly as likely to be as accurate as in recorded testimony contained in a deposition. *E. g., Coffin v. Bradbury,* 3 Idaho 770, 35 P. 715 (1894); *Clarke v. Blackfoot Water Works, Ltd.,* 39 Idaho 304, 228 P. 326 (1924).

Secondly, I.R.C.P. 26(d)(2) provided:

"RULE 26(d)(2). *Use Where Deponent a Party.*—The deposition of a party . . . may be used by an adverse party *for any purpose.*" (Emphasis supplied).

However, the trial court relied upon the language of I.R.C.P. 26(d)(3) which provided:

"RULE 26(d)(3). *Use For Any Purpose.*—The deposition of a witness, *whether or not a party,* may be used by any party for any purpose if the court finds: 1, that the witness is dead; or 2, that the witness is at a greater distance than one hundred (100) miles from the place of trial or hearing, or is out of the state of Idaho, unless it appears that the absence of the witness was procured by the party offering the deposition; or 3, that the witness is unable to attend or testify because of age, sickness, infirmity or imprisonment; or 4, that the party offering the deposition has been unable to procure the attendance of the witness by subpoena; or 5, upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due re-

gard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used." (Emphasis supplied).

Rule 26(d)(2), dealing with depositions of parties, does not require that the party be unavailable before the party's deposition can be admissible for all purposes. Rule 26(d)(3) was not intended to limit the scope of Rule 26(d)(2) which specifically states without limitation that the deposition of a party can be used "for any purpose." In so construing Rule 26(d)(2) and (3) we are reaching the same conclusion as the majority of the federal courts that have construed the identical language contained in the federal rule.

"Rule 32(a)(2) [which is identical to the pre-1975 I.R.C.P. 26(d)(2)] permits the deposition of a party to be used by any adverse party for any purpose at the trial or hearing, even though the party is present at the trial and has testified orally. In that situation the deposition may be used as evidence of an admission and may be introduced as independent original evidence by the adverse party and not merely for purposes of impeachment . . . ." 4A Moore, Federal Practice, ¶ 32.04, pp. 32-15-16 (1974).

"The trial court . . . may not refuse to allow the deposition to be used merely because the party is available to testify in person." 8 Wright & Miller, Federal Practice and Procedure, § 2145, at p. 456 (1970).

Not only have the federal courts followed the practice of allowing a deposition of an adverse party into evidence without regard to whether the party is available to testify at trial, *Pingatore v. Montgomery Ward and Co.,* 419 F.2d 1138 (6th Cir. 1969), *cert. denied,* 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed.2d 90 (1970); *Pursche v. Atlas Scraper and Engineering Co.,* 300 F.2d 467

to admit a deposition showing the absence, inability to obtain the witness's deposition or something must be established even to use the deposition of a party for anything other than impeachment purposes . . . .

"MR. BISTLINE: I have authority to the contrary but I assume you have seen it and still are not going to allow us to do this? "THE COURT: That is correct." (Rptr. Tr., Vol. I, pp. 6–7).

(9th Cir. 1961), *cert. denied,* 371 U.S. 911, 83 S.Ct. 251, 9 L.Ed.2d 170 (1962); *Community Counselling Service, Inc. v. Reilly,* 317 F.2d 239 (4th Cir. 1963); but this has also been the practice in the state courts in states having this or a similar rule, *e. g., Mayhood v. LaRosa,* 58 Cal.2d 498, 24 Cal.Rptr. 837, 374 P.2d 805 (1962); *Mesecher v. Cropp,* 213 Kan. 695, 518 P.2d 504 (1974); *Naumburg v. Wagner,* 81 N.M. 242, 465 P.2d 521 (1970); *Young v. Liddington,* 309 P.2d 761, 50 Wash.2d 78 (1957). Thus, it was error to exclude the depositions of Roy C. Myers, Sr., and Robert Myers as substantive evidence, and since consideration of this improperly excluded evidence could have substantially affected finding of fact XIII, the error was prejudicial.

■ The appellants further attack the trial court's findings of fact VII and XIII which found that in exchange for receiving Roy C. Myers, Sr.'s, three-fourths interest in the Bonners Ferry ranch, Robert Myers transferred to Roy C. Myers, Sr., a contract with a value of $68,000 and cancelled his father's debts in the sum of $18,767. From those findings the trial court had determined that Robert Myers had paid his father $86,767 for this three-fourths interest in the Bonners Ferry property which the trial court found to have been worth $94,344, and thus the trial court found that Robert Myers had paid a "fair value." While there is substantial evidence to uphold the finding that Roy C. Myers, Sr., was indebted to Robert Myers in the sum of $18,767, and that the debt was cancelled, the record does not support the finding that the contract transferred to Roy C. Myers, Sr., had a value of $68,000. During the course of the trial, counsel for Robert Myers had stipulated that although the contract recited that there was $68,000 due on it, the contract was subject to an indebtedness and the parties stipulated that the net amount due under the contract was either $51,000 or $51,700. (Rptr. Tr., p. 274). Furthermore, Roy C. Myers, Sr., testified that because the contract was a second contract (second security) it was not worth the full $51,000, but that its value must be discounted by 25–30% of that amount. (Rptr. Tr., p. 260). Robert Myers' testimony confirmed that the $68,000 unpaid principal on the contract had about $16,000 indebtedness against it. (Rptr. Tr., pp. 163–164). Robert Myers claimed that he would not personally have discounted the contract below the $51,700 net figure, although he did not contradict his father's testimony that to have sold the contract in 1959 would have required a 25–30% discount of its value. Thus, there is no evidence to support the trial court's finding of fact that the value of the contract transferred was $68,000, and this finding is contrary to the evidence and is set aside.

■ Because of the trial court's erroneous failure to consider the depositions of Roy C. Myers, Sr., and Robert Myers as substantive evidence of the facts stated therein, the valuation of Roy C. Myers, Sr.'s, interest in the Bonners Ferry ranch could have been substantially affected. Further, as a result of the trial court's erroneous finding of fact concerning the value of the contract transferred to Roy C. Myers, Sr., by Robert Myers, the value of the consideration given by Robert Myers to Roy C. Myers, Sr., for the transfer of the three-fourths interest in the Bonners Ferry property was substantially over-valued. Therefore, the trial court's conclusion of law that Robert Myers paid fair value for the three-fourths interest of Roy C. Myers, Sr., in the Bonners Ferry ranch cannot be sustained and is set aside.

The appellants Blankenship further assign as error the trial court's finding of fact XIV which found that, "There is no evidence before the Court to establish clear and convincingly that the transaction rendered Roy Myers insolvent or that he was not in fact solvent on the 7th day of April, 1959." The Blankenships make two objections to this finding of fact: (1) that the finding is not supported by the evidence, and (2) that had the trial court considered

Roy C. Myers, Sr.'s statements in his erroneously excluded deposition as substantial evidence instead of merely considering them for impeachment purposes, consideration of the deposition as substantial evidence would have materially affected the finding.

■ Regarding the first argument, our review of the record shows that the evidence is contrary to the finding. Roy C. Myers, Sr., testified that from 1956 to 1959 he had been engaged in a series of lawsuits, during which time "that man Patrick took everything I had and pretty near did it, too." In his affidavit filed early in this litigation, he said that he had attempted to sell the Bonners Ferry ranch to some of his children, but then sold it only to his son Robert. Within five months after he had transferred his share of the Bonners Ferry ranch to Robert, he had entered into the first of two agreements with three of his other children in which he turned over all of his remaining assets (except one motor vehicle he valued at $100 and his judgment against Patrick, which he "didn't figure . . . was worth a dime") in consideration for their assuming certain of his obligations. The first agreement, dated September 22, 1959, called for them to assume obligations in the sum certain of $82,707.14, plus pay additional attorney fees, taxes and other expenses as they came due. The second agreement, dated October 15, 1959, called for them to assume additional liabilities not listed in the first one, although it did omit the assumption of a $15,000 promissory note payable to his daughter Jean Bower, who was a party to both agreements. According to the uncontradicted finding of the Washington trial court in the earlier suit between the Blankenships and Roy C. Myers, Sr., under this agreement his children had paid or become obligated to pay $98,308.15 before January 28, 1960. (Finding of fact XXIX, p. 13, Defendant's exhibit G).

Roy C. Myers, Sr., gave the following testimony at trial concerning his financial condition at the time he transferred his three-fourths interest in the Bonners Ferry property to his son and at the time he entered into two other transactions with his other children some six months later:

"Q. I wish you would tell the judge then whether you owed any money by the time you sold to Bob, you gave or transferred your interest in the Bonners Ferry ranch to Bob?

"A. Well, I owed a bunch of attorneys in Spokane a bunch of money, I had to settle some way with them, and I didn't have any money and my assets were all tied up in litigation and everything.

. . . . . .

"Q. . . . By the time you had transferred this property to Bob and other property to your children, you were just about broke?

"A. I was broke.

. . . . . .

"Q. I think, as a matter of fact, you said it left you worse than broke, it left you still owing money?

"A. Yes . . . .

"Q. You do remember this, that by the time you transferred this property to Bob Myers and got through with these transfers to your children in 1959, you were worse than broke?

"A. Well, after I got rid of that property I didn't have anything, that was for sure, couldn't attempt to pay my debts." (Rptr.Tr., pp. 265–267).

Roy C. Myers, Sr., testified that he was "broke" and "couldn't attempt to pay [his] debts" by September and October of 1959, when he had entered into the transactions with his children. In his deposition of September 20, 1962, the following portion of which was read into the record for impeachment purposes but was not considered by the trial court as substantive evidence, he gave the following description of the transaction with his children:

" 'Q. Well, in your own mind did you give them more than you received?

" 'A. If they fought it out for 15, 20 years, they could come out ahead.

" 'Q. Did you figure the stuff as being worth more—What you turned over to them as being worth more than $100,000.00?

" 'A. Well, that probably would be more than you could have sold the contracts for, cash money.' " (Rptr.Tr., pp. 348–349).

Roy C. Myers, Sr.'s, testimony in the deposition, which the trial court did not consider as substantive evidence, was to the effect that he had turned over property to his children which was not worth over $100,000. In exchange for this, the evidence shows that his children assumed liabilities of approximately that amount and the uncontradicted finding of the Washington trial court was that within five months after entering into the transaction his children had paid or become obligated to pay over $98,000 on his existing debts. This evidence, together with Roy C. Myers, Sr.'s, testimony that after the transfer to his children he was "broke," suggests that in September of 1959, immediately before he made the transfer to his children, his assets were worth no more than $100,000 and, without considering the Blankenships' $50,000 claim against him, he was indebted for nearly that amount. When the Blankenships' claim against him is taken into consideration, it is apparent that his liabilities exceeded his assets by at least an amount approximately equal to the Blankenships' claim, or $50,000. Furthermore, Roy C. Myers, Sr.'s, income tax return for the year 1959 shows no large losses which could have materially altered his financial condition between the transfer here in question in April, 1959, and the transfer of the balance of his assets in August and September of that year.

In *Buhl State Bank v. Glander*, 56 Idaho 543, 56 P.2d 757 (1936), this Court made the following comments concerning the reasonableness of inferring that a person was insolvent on a given date from evidence of the person's insolvency at a later time.

"The question then to be determined is whether respondent made a *prima facie* case showing that the grantors after the transfers in question did not own or retain sufficient property to pay their debts to respondent. . . . [The] unsatisfied execution stands with all the reasonable implications to be drawn therefrom, and the rule with regard to giving retroactive effect thereto is thus stated in *Beacon Trust Co. v. Wright*, 288 Mass. 1, 192 N.E. 70, at 72:

' . . . The admissibility and sufficiency of evidence of insolvency on August 5, 1925, to prove insolvency on May 13, 1925, cannot be determined by any formula. The answer depends upon rational probabilities in the light of human experience. Nothing in the record suggests any change in financial status after the earlier date. . . . [W]e think the evidence was admissible, and sufficient to warrant the finding of insolvency on May 13, 1925. . . .'

"Herein the record does not show that there was any material change in the financial condition of grantors, between the time of the conveyances and the time of the return of this execution unsatisfied, other than said asserted fraudulent transfers and the disposition of the personal property hereinafter detailed." 56 Idaho at 548–549, 56 P.2d at 759.

This Court in *Glander* affirmed the district court order setting aside the transfers involved as in fraud of creditors. In doing so it upheld the district court's inference that the defendant was insolvent on October 31, 1931, from (1) evidence that an execution issued on July 5, 1932, was returned unsatisfied on July 22, 1932, some nine months after October 31, 1931, and (2) the failure to introduce evidence showing a significant change in financial status during that period.

Had the trial court considered Roy C. Myers, Sr.'s, deposition as substantive evidence, then under the rule of *Glander* the statements contained in that deposition taken in conjunction with the other evidence

introduced at trial may have led the trial court to infer from the evidence that Roy C. Myers, Sr.'s, liabilities exceeded his assets by approximately $50,000 in September and October of 1959 and that Roy C. Myers, Sr., was insolvent on April 7, 1959, the time of the transfer to his son Robert. Thus, the failure to consider Roy C. Myers, Sr.'s, deposition as substantive evidence may have materially affected finding of fact XIV and the failure to consider Roy C. Myers, Sr.'s, deposition as substantive evidence was prejudicial error.

■ Further, in determining that there was no fraudulent transfer as a result of Roy C. Myers, Sr., conveying his three-fourths interest in the Bonners Ferry property to his son Robert, the trial court indicated in its memorandum opinion that the law applicable to this transaction was the Uniform Fraudulent Conveyance Act, I.C. §§ 55–910–922, enacted in 1969. Prior to 1969 the statutes dealing with unlawful or fraudulent transfers were codified in I.C. §§ 55–901–09. The transfer in question occurred in 1959, and we thus conclude that the trial court erred in the retroactive application of the Uniform Fraudulent Conveyance Act. "No law in this state is to be applied retroactively, absent a clear indication of [a] legislative intent to the contrary." *Edwards v. Walker,* 95 Idaho 289, 291, 507 P.2d 486, 488 (1973); *Kent v. Public Utilities Commission,* 93 Idaho 618, 469 P.2d 745 (1970). I.C. § 73–101. Thus, the applicable law which the trial court should have applied was I.C. §§ 55–901–09, as amended and in effect in 1959, as authoritatively construed by this Court in *Mohar v. McLelland Lumber Co.,* 95 Idaho 38, 501 P.2d 722 (1972), and *Buhl State Bank v. Glander, supra.*

■ Finally, in *Mohar v. McLelland Lumber Co., supra,* this Court said:

"Although a conveyance be supported by fair and valuable consideration, it may be set aside with respect to creditors if it is the product of a fraudulent attempt by the debtor and transferee to obstruct access to the debtor's property for satisfac-

tion of legitimate claims. This type of fraudulent conveyance is marked by an actual intent of both the debtor and transferee, to defraud the creditors. Whether a particular transaction was fraudulent is a question of fact to be determined from all the circumstances. Actual fraud must be proven by clear and convincing evidence; but when certain 'badges of fraud' attend the conveyance, and are not adequately explained, an inference of actual fraud may be warranted." 95 Idaho at 42, 501 P.2d at 726, footnotes omitted.

Because the trial court made no finding concerning the Blankenships' assertion that the transfer from Roy C. Myers, Sr., to his son Robert was a fraudulent conveyance of this kind, the case must be remanded for further proceedings upon that issue.

## THE VENDOR'S LIEN ISSUES

The second group of issues which we must consider concerns the Blankenships' claim to a vendor's lien upon the Bonners Ferry ranch. The vendor's lien is a statutory lien created by I.C. § 45–801, which provides:

"45–801. *Vendor's Lien.*—One who sells real property has a vendor's lien thereon, independent of possession, for so much of the price as remains unpaid and unsecured otherwise than by the personal obligation of the buyer."

The trial court concluded in its memorandum opinion that there were four reasons why the Blankenships could not enforce a vendor's lien upon the property: (1) the Blankenships had received the full consideration upon which the parties had agreed at the time of the sale of the property, i.e., the Moses-Coulee ranch, and thus no part of the price remained unpaid and there was no right to a vendor's lien; (2) moreover, assuming that the consideration for the Bonners Ferry ranch was not the Moses-Coulee ranch, but was instead the $105,000 in contracts and other securities, because the unpaid amount was represented by contracts and securities, there was no

unpaid purchase price "unsecured otherwise than by the personal obligation of the buyer" and thus the Blankenships had no right to a vendor's lien; (3) furthermore, the trial court held that, assuming that the Blankenships had a vendor's lien, when they filed their complaint they waived the lien by filing a writ of attachment against the property; and (4) finally, the trial court concluded that the action to foreclose a vendor's lien was barred by the statute of limitations. We have reviewed the record and conclude that there was no substantial, competent evidence in the record to support the finding that we have labeled (1), and that the conclusions we have labeled (2), (3) and (4) are in error as a matter of law, and the court must conduct further evidentiary proceedings upon the matter we have labeled (4). Accordingly, for the reasons set forth below, we also remand the case to the trial court for further proceedings on the vendor's lien claim.

1. *Consideration issue.*

The first question that we must consider on the vendor's lien issue is whether the Blankenships received the full consideration they bargained for in the exchange for the Bonners Ferry ranch, i.e., whether any of the purchase price was unpaid. The trial court made the following finding in this regard:

"XV

"The exchange of deed of the Moses Coulee property for the Boundary County Ranch was a completed transaction without additional purchase price unpaid. The $50,000 debt, the subject of this suit, arose from the purchase of the Moses Coulee property independent of the original sale and purchase." (Clk.Tr., p. 63).

The only evidence in the record tending to support this finding by the Idaho trial court is the finding of fact made by the Washington trial court in the earlier suit between the Blankenships and Roy C. Myers, Sr. The Washington trial court made the following finding of fact with respect to this matter:

"XVI

"This Court finds that the defendants Blankenship originally agreed to exchange their equity in the Bonners Ferry Ranch for the Moses Coulee Ranch free and clear, *and that this transaction was consummated,* but that subsequently the consideration was switched around and Blankenship agreed to return the Moses Coulee deeds to Mr. Myers in exchange for a $105,000 credit on the Vic Weitz Ranch. . . ." (Defendant's Exhibit G, p. 9, emphasis added).

However, the Washington trial court also made the following finding:

"VII

"The Court finds that the defendants *Blankenship did not want and never did want to own or take possession of the Moses Coulee Ranch* and that the deeds that were executed by Mr. Myers were returned by Mr. Blankenship through Al Patrick and that the signatures which appear thereon were crossed out. . . ." (Defendant's Exhibit G, p. 5, emphasis added).

We need not decide whether a finding of the Washington trial court in a trial in which not all the parties to this action and appeal were parties may be substantial, competent evidence of the matter found therein. This is because we do not believe that findings XVI and VII are consistent under either the law of Washington or the law of Idaho and thus, because they are inconsistent, we hold that neither of them constitutes substantial, competent evidence of the matter found therein.

It is a common element of the real property law of both Idaho and Washington that for a deed to be effective the grantee must accept it. In *Bowers v. Cottrell,* 15 Idaho 221, 96 P. 936 (1908), this

Court quoted the following passage with approval:

> " ' "Delivery includes surrender and acceptance, and both are necessary to its completion. This must be the result of a contract—the meeting of two minds, the accord of two wills. The grantor must be willing and agree to deliver, *and the grantee must be willing and consent to receive, and this accord of wills must be evidenced in some way, to show the unequivocal intention of both parties that the instrument shall take effect according to its purport and tenor." ' "* 15 Idaho at 228–229, 96 P. at 938 (emphasis added).

In *Showalter v. Spangle,* 93 Wash. 326, 160 P. 1042 (1916), the Supreme Court of Washington said:

> *"It is essential to the delivery of a deed that there be a giving by the grantor and a receiving by the grantee with a mutual intention to pass a present title from the one to the other.* . . . This mutual intention is the cardinal requisite. (Citations omitted)." 160 P. at 1044 (emphasis added).

These cases demonstrate that under both Idaho and Washington law acceptance of a deed means more than the grantee taking possession of a deed; acceptance of the deed requires an intent to accept the property represented by the deed, not the physical possession of the deed itself. Under these decisions, finding of fact VII of the Washington trial court that the Blankenships never wanted to own or take possession of the Moses-Coulee ranch is inconsistent with finding of fact XVI that the exchange of the equity in the Bonners Ferry ranch for the Moses-Coulee ranch was a consummated transaction, i.e., that the Blankenships accepted the Moses-Coulee ranch. One cannot say that finding of fact XVI has more validity than finding of fact VII, and thus we must conclude that neither finding of fact XVI nor VII is substantial, competent evidence of the matter found therein.

The only other evidence in the record pertaining to this matter was Dwayne Blankenship's testimony that he did not want to own the Moses-Coulee property and only entered into the transaction because Patrick had represented that the Moses-Coulee property was already sold and that Blankenship could use the proceeds from that sale to buy the Vic Weitz ranch, the property he claimed he really wanted. This was further substantiated by the Roy C. Myers, Sr., deposition which was erroneously excluded from evidence. Thus, there is no evidence in the record to support finding of fact XV of the Idaho trial court that the exchange of deeds was a completed transaction. The case must be remanded for a factual determination of whether the Blankenships received the full consideration for the Bonners Ferry ranch to which the parties had agreed.

2. *Security issue.*

The second reason the trial court gave for ruling that the Blankenships did not have a vendor's lien was that, assuming that the $105,000 in contracts and securities, rather than the Moses-Coulee property, was consideration for the Bonners Ferry ranch, the $50,000 which remained unpaid was not "unsecured otherwise than by the personal obligation of the buyer," but was represented by contract rights and other securities. We think it is a strained construction of I.C. § 45–801 to say that if a seller agrees to accept contract rights and securities as payment for property, but the contracts and securities are stolen through no fault of the seller before he receives them, nevertheless payment is secured by the stolen contract rights and securities. A more reasonable interpretation of the statute is that regardless of the nature of the consideration or collateral that the buyer may promise to give the seller, if through no fault of the seller the seller never receives such consideration or collateral from the buyer, then the seller is unpaid and unsecured and has a vendor's lien. *Cf. Simmons Hardware*

*Co. v. Alturas Commercial Co.*, 4 Idaho 334, 39 P. 550 (1895), in which the Court held that when an agreement to give a creditor security was not carried out according to its terms and the creditor rejected the security, the creditor did not have such security as precluded him from obtaining an attachment. On remand if the trial court finds that the purchase price of the Bonners Ferry ranch was the $105,000 in contracts and securities, rather than the Moses-Coulee property, then I.C. § 45–801 does not preclude the Blankenships from claiming a vendor's lien for the $50,000 representing that portion of the purchase price which was to be paid in contract rights and securities which were converted by Patrick and which the Blankenships never received.

3. *Lien waiver issue.*

The third reason given by the trial court for concluding that the Blankenships had no vendor's lien was that even if they had a vendor's lien, they waived it by making the following averment in their affidavit for attachment of the property in question at the commencement of the action:

> "Payment of the indebtedness has not been secured by any mortgage or lien upon real or personal property or any pledge of personal property."

I.C. §§ 8–501–02 [4] require such an averment in an affidavit accompanying a petition for writ of attachment. The question presented by the trial court's ruling is whether the Blankenships waived a vendor's lien, if they had one, by making such an averment in their affidavit. We think not.

The Blankenships argue that a vendor's lien is not the type of security contemplated by the attachment statutes, and that thus they had no security within the meaning of I.C. § 8–501. In support of this proposition, they cite the case of *Porter v. Brooks*, 35 Cal. 199 (1868). They argue that because Idaho's attachment lien statutes were enacted after the *Porter* case construed a similar provision of the California law, that the Idaho legislature also adopted the California court's construction of the attachment statutes. However, the vendor's lien described in *Porter v. Brooks* was not a statutory lien as is the lien we are dealing with on this appeal, and the decision in *Porter* was based upon the nonstatutory "ephemeral" character of the lien. For that reason, we do not believe that *Porter v. Brooks* is necessarily controlling even if the legislature impliedly adopted the construction of the attachment statutes contained in that opinion.

This does not mean, however, that by filing the affidavit in question the Blankenships waived their lien. If the Blankenships' affidavit was inaccurate because it stated that they had no security when in fact they did have security within the meaning of the attachment lien statute, they have not waived their rights under the vendor's lien and become entitled to attachment; rather, their attachment of the property is not in compliance with the statute and may be dissolved. *See Heinrich v.*

4. "8–501. *Attachment—When Issued.*—The plaintiff at the time of the issuing of summons, or at any time afterwards may have the property of the defendant attached, as security for the satisfaction of any judgment that may be recovered, unless the defendant gives security to pay such judgment as in this chapter provided in the following cases.
. . . ."
"8–502. *Affidavit.*—The clerk of the court must issue the writ of attachment upon receiving an affidavit by or on behalf of plaintiff setting forth:
"1. That the defendant is debted to the plaintiff (specifying the amount of such indebtedness over and above all legal set-offs or counterclaims) and whether upon a judgment or upon a contract for the direct payment of money, and that the payment of the same has not been secured by any mortgage or lien upon real or personal property, or any pledge of personal property, or if originally secured, that such security has, without any act of the plaintiff, or the person to whom the security was given, become valueless.
. . . ."
The statutes were amended in 1974; they are quoted as they existed at the time the Blankenships filed their affidavit for attachment.

*Barlow,* 87 Idaho 72, 390 P.2d 831 (1964); *Mason v. Jansen,* 45 Idaho 354, 263 P.2d 484 (1927); *Murphy v. Montandon,* 3 Idaho 325, 29 P. 851 (1892), in which attachments were dissolved because the attaching party's debt was secured. As this Court said in *Mark Means Transfer Co. v. Mackinzie,* 9 Idaho 165, 73 P. 135 (1903):

> "[W]e think [that retention of the title is] clearly a security within both the letter and spirit of the attachment statute . . . and . . . the plaintiff could not abandon such security, because, perchance, he preferred an attachment lien to the security he already had." 9 Idaho at 176, 73 P. at 138.

*Mark Means* held that if a party seeking attachment has a lien barring attachment, the lien did not become ineffective by seeking an attachment; rather, the attachment should have been dissolved and the rights of the parties determined under whatever security interests were in existence. Thus, the Blankenships did not waive their vendor's lien, if they had one, by seeking attachment.

■ Additionally, the purpose of the statute prohibiting an attachment where the indebtedness was already secured is to prevent a secured creditor from attaching additional property and thus tying up more of the debtor's property than was necessary to secure the indebtedness. However, in this case, the attachment was upon the same real property against which the vendor's lien was claimed. This was not a case of unnecessarily attaching property when the creditor had adequate security in

other property, but of attempting to bolster questionable security on a single piece of real property. This does not appear to be the type of transaction contemplated by I.C. § 8–502 prohibiting attachment for indebtedness on property where the creditor already has security for that property.

*4. Statute of limitations issue.*

Finally, the trial court concluded that the Blankenships' claim of a vendor's lien was barred by the statute of limitations, I.C. § 5–216,[5] because the Blankenships initiated this suit on April 6, 1962, more than five years after August 8, 1956, the day of the conveyance of the Bonners Ferry ranch and the day that the consideration for it was due. In its memorandum opinion the trial court gave two reasons for its ruling: (1) because Roy C. Myers, Sr., was at all times subject to the personal jurisdiction of the courts of Idaho under the "long arm statute," I.C. § 5–514,[6] he was never absent from the state within the meaning of I.C. § 5–229,[7] which tolls the running of the statute of limitations during a defendant's absence from the state, and (2) because the trial court considered the enforcement of a vendor's lien to be an action *in rem* rather than an action *in personam,* it was not necessary to obtain personal jurisdiction over Roy C. Myers, Sr., to enforce the lien and thus it was not necessary to join Roy C. Myers, Sr., as a defendant to enforce the lien and his absence from the state would not bar the running of the statute.

■ While we agree with the trial court that where jurisdiction of a defend-

---

5. "5–216. *Action On Written Contract.*— Within five years:

"An action upon any contract, obligation or liability founded upon an instrument in writing.
. . ."

6. "5–514. *Acts Subjecting Persons To Jurisdiction Of Courts Of State.*—Any person . . . who in person or through an agent does any of the acts hereinafter enumerated, thereby submits said person . . . to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of said acts:

.    .    .    .    .

"(c) The ownership, use or possession of any real property situate within the state;
. . ."

7. "5–229. *Absence Of Defendant From State.*—If, when the cause of action accrues against a person, he is out of the state, the action may be commenced within the term herein limited, after his return to the state, and if, after the cause of action accrues, he departs from the state, the time of his absence is not part of the time limited for the commencement of the action."

ant may be had under the "long arm statute," that the defendant is not absent from the state within the meaning of I.C. § 5-229, and that the trial court's decision in this regard anticipated our decision in the case of *Lipe v. Javelin Tire Co., Inc.,* 96 Idaho 723, 536 P.2d 291 (1975), nevertheless we disagree that the statute of limitations had necessarily run against the Blankenships' claim of a vendor's lien if in fact they prove that the $50,000 Washington judgment was for the purchase price of the Bonners Ferry ranch.

■ The vendor's lien is a lien created by statute, I.C. § 45-801, to protect the unsecured seller of real property by giving him rights in the property sold, subject to the rights of a good faith purchaser for value as provided in I.C. § 45-803, when he has no other collateral to secure payment for the property. This statutory lien codified the common law rule which established a vendor's lien under similar circumstances. At common law the vendor's lien generally could be enforced against the vendee as long as the vendor could still bring an action against the buyer for the unpaid purchase price. *See* 77 Am.Jur.2d, Vendor & Purchaser, § 462, p. 588 (1975). An action for enforcement of a vendor's lien and an action for the unpaid purchase price are so interrelated that it is reasonable to conclude that the legislature intended that the statute of limitations for the lien claim would run only when the statute of limitations runs to bar the claim for the debt. We adopt the following language of the Supreme Court of California in the case

of *Finnell v. Finnell,* 156 Cal. 589, 105 P. 740 (1909), in which the California court, which construed a vendor's lien statute substantially identical to Idaho's, stated:

> "The right of a vendor to enforce his lien continues, unless waived, so long as an action can be commenced for the purchase money . . . ." 105 P. at 744.

■ The Blankenships tranferred the Bonners Ferry ranch to the Myerses in August of 1956. The Blankenships were joined as a defendant by the Myerses in the action filed in the Washington court on July 17, 1959. They counterclaimed in that action for the $50,000 which the Blankenships claim was still due them for the Bonners Ferry ranch, and on November 24, 1961, judgment was rendered in their favor for $50,000 by the Washington court. Thereafter, on April 6, 1962, less than six months later, the Blankenships filed this action in Boundary County, based upon their Washington judgment, to set aside the transfer from Roy C. Myers, Sr., to Robert Myers as in fraud of creditors, and to assert a vendor's lien for the $50,000. There is no contention that the plaintiffs' cause of action, based on the Washington judgment, is barred by the statute of limitations. We conclude that as long as the claim is not barred, the lien is not barred.

Reversed and remanded for new trial. Costs to appellants.

McQUADE, C. J., and McFADDEN, DONALDSON and SHEPARD, JJ., concur.