691 P.2d 1212

**RICHARD B. SMITH REAL ESTATE, INC., Plaintiff-Appellant,**

v.

**Kent KNUDSON and Christine E. Knudson, husband and wife, Defendants-Respondents.**

**No. 15062.**

Supreme Court of Idaho.

Nov. 30, 1984.

E. Don Copple of Davison, Copple, Copple & Copple, Boise, for plaintiff-appellant.

Mark S. Prusynski of Moffatt, Thomas, Barrett & Blanton, Boise, for defendants-respondents.

BAKES, Justice.

Richard B. Smith Real Estate, Inc., appeals the district court's grant of the Knudsons' summary judgment motion. In granting the motion, the district court ruled that the Knudsons need not pay a realtor's fee, pursuant to a broker's contract executed between Richard B. Smith and the Knudsons, when the Knudsons' property was reconveyed to the successor of the original contract seller to prevent forfeiture of the property. We affirm the district court.

On February 1, 1980, respondents, Marvin K. and Christine B. Knudson, entered into a contract to purchase real property from Dennis Dillon, Joan Dillon, Henry Batey and Marie Batey. The contract required the Knudsons to pay $168,857.04 for the property. Shortly after the purchase, the seller's interest was transferred to Batey, Inc.

In September of 1981, Mr. Knudson lost his job in Boise. Unable to make a $20,000 balloon payment which was due on October 15, 1981, the Knudsons received an extension from Batey, Inc., extending the time of payment until May 1, 1982.

On November 17, 1981, the Knudsons entered into a brokerage contract giving Richard B. Smith Real Estate exclusive authority to sell the property. The brokerage contract was terminated on June 1, 1982. Under the brokerage contract, Richard B. Smith Real Estate was to receive a 6% commission not only if it sold the property, but also if the "[o]wner or anyone else sells, trades or in any way disposes of the property within the time specified herein." The contract also contained an attorney fee clause which awarded attorney fees to the successful party in the event of any litigation or controversy arising out of the contract.

Subsequent to the execution of the broker's contract Mr. Knudson obtained employment with Iowa Beef Processors and moved to Sioux City, Iowa. As part of the contract of employment, Iowa Beef Processors agreed to pay the Knudsons $12,000 as a reimbursement for anticipated realtor's fees.

While the property was listed with Richard B. Smith Real Estate, only one prospective buyer looked at the property. That

prospective buyer was Carolyn Batey Nagy, the daughter of two of the original sellers. Although she deposited $1,000 in earnest money with Richard B. Smith Realty, Ms. Nagy could not find the financing necessary to complete the purchase. Thus, a buyer for the property was not found and the Knudsons were unable to make the $20,000 balloon payment due on May 1, 1982.

Rather than face forfeiture of the property, the Knudsons agreed to quitclaim the property to Batey, Inc. In exchange Batey, Inc., paid the Knudsons $5,000 as a reimbursement for improvements made to the property by the Knudsons. (The record does not indicate whether this was an oral arrangement or whether a written contract was executed.) A quitclaim deed was prepared by Batey, Inc., and mailed to the Knudsons. The Knudsons executed the deed on May 26, 1982, and returned it by mail. The deed was received by Batey, Inc.'s, attorney on June 2, 1982. No commission was paid to Richard B. Smith Realty following this exchange.

Richard B. Smith Realty filed suit alleging breach of the broker's contract. Both parties filed motions seeking summary judgment.

■ The district court denied Smith's motion for summary judgment and granted the Knudsons' motion for summary judgment on the grounds that the broker's agreement was clearly intended to apply only to voluntary "dispositions" of the property. The court also noted that Ms. Nagy's earnest money was to be apportioned between the parties equally according to the earnest money agreement. As prevailing parties in a dispute arising from the broker's contract, the Knudsons were awarded attorney fees and costs. The sole issue on appeal is whether the district court correctly determined that the Knudsons were not liable under the broker's contract for payment of a broker's commission when the Knudsons' property was reconveyed to the successor of the original contract seller to prevent a forfeiture.

## I

The trial court ruled that the word "dispose" in the agreement clearly did not "apply to a deed received by a third party in lieu of forfeiture, or foreclosure." We agree with the district court. The purpose of the broker's contract was to compensate Richard B. Smith Real Estate for assisting the Knudsons in the sale of their home. Richard B. Smith Real Estate's broad interpretation of the word "dispose" would require commission payment for transfers unrelated to a voluntary disposition of the home. Such a broad construction could require payment of a commission if the property were transferred during probate or seized for satisfaction of unpaid property taxes. Thus, the district court was correct in granting the Knudsons' summary judgment motion.

## II

■ In any event, the trial court's decision should be affirmed if the grant of the summary judgment order was proper on any ground. *See City of Weippe v. Yarno*, 96 Idaho 319, 323, 528 P.2d 201, 205 (1974); *Church v. Roemer*, 94 Idaho 782, 787, 498 P.2d 1255, 1260 (1972).

It is undisputed that the broker's contract expired June 1, 1982. Batey, Inc., did not receive the deed until June 2, 1982, the day following expiration of the contract. Since a valid transfer of title requires delivery by the grantor and acceptance of the deed by the grantee, *Blankenship v. Myers*, 97 Idaho 356, 367–68, 544 P.2d 314, 325–26 (1975); *Crenshaw v. Crenshaw*, 68 Idaho 470, 475, 199 P.2d 264, 266 (1948), it is clear that the transfer of the property was not complete until *after* the expiration of the contract. Accordingly, the district court was correct in granting the Knudsons' summary judgment motion since Richard B. Smith Realty would not be entitled to a commission on this transfer. Pursuant to the broker's contract, the Knudsons are to be awarded attorney fees as the successful party in this appeal.

SHEPARD and HUNTLEY, JJ., concur.

DONALDSON, C.J., sat but did not participate.

BISTLINE, Justice, dissenting.

The majority opinion may believe itself to be achieving what appears to be a just result, but in the process it does substantial damage to contract law. The listing agreement which the Knudsons signed *is* a contract, and it granted the broker the exclusive right to sell or exchange the property from the date of signing until June 1, 1982. Exclusive listings are not unknown or uncommon. The teeth in exclusive listings are ordinarily, as here, the provisions whereby the broker protects the right to a commission even though his own efforts may fail to produce a qualified buyer. The built-in protection here attempted is found in the language of the listing agreement which declares that the broker shall receive six percent of the selling price not only if he finds a buyer, but, as here applicable, if the owner "sells, trades or in any way disposes of the property" within the term of the listing agreement.

The majority opinion, in upholding the district court does so on the basis of the following statement, *wholly unsupported by any statement* of authority:

> The purpose of the broker's contract was to compensate Richard B. Smith Real Estate for assisting the Knudsons in the sale of their home. Richard B. Smith Real Estate's broad interpretation of the word "dispose" would require commission payment for transfers unrelated to a voluntary disposition of the home. Such a broad construction could require payment of a commission if the property were transferred during probate or seized for satisfaction of unpaid property taxes. Thus, the district court was correct in granting the Knudsons' summary judgment motion.

Such a facile disposition of a very important case does nothing to further the science of jurisprudence. It is a pure case of setting up a straw man in order to knock it over. We have no issue before us related to involuntary dispositions of real property such as transfer of title in probate, or the sale of realty to satisfy unpaid property taxes. A probate transfer is suggestive of the fact of the owner's death, a factor which one might assume would automatically terminate an unperformed unilateral executory contract—which most legal minds would see as an automatic termination of the listing agreement—which creates an agency, and we all know what happens when either the principal or the agent dies. A tax sale would as readily terminate the agreement—the subject matter of an executory contract having become non-existent. *Koron v. Myers,* 87 Idaho 567, 394 P.2d 634 (1964), quoting from 17A C.J.S. Contracts, § 466(1), and Corbin on Contracts, Vol. 6, § 1337. "By reason of the destruction of the property the rule of law hereinbefore announced discharged each of the parties form further liability under the terms of the agreements." *Koron, supra,* at 575, 394 P.2d at 639.

Putting aside probates and tax sales, the concern of the majority here should be directed at examining a considerable body of authority presented by the appellant, Richard B. Smith Real Estate, Inc. (Smith, Inc.) standing for the proposition that reconveyances in situations such as this have been judicially determined to be within the definition of sales. *Whiteman & Co. v. Fidei,* 176 Pa.Super. 142, 106 A.2d 644 (Pa. 1954); *Schulte v. Crites,* 300 S.W.2d 819 (Mo.App.1957). The Knudsons' brief acknowledges the import of those two cases, but relies on the contrary cases of *Sientz v. Spottiswoode-Cusack Co.,* 21 N.J.Misc. 479, 34 A.2d 591 (N.J.1943), and *Felbinger & Co. v. Traiforos,* 76 Ill.App.3d 725, 31 Ill.Dec. 906, 394 N.E.2d 1283 (Ill.1979), for the proposition that a "deed in lieu of foreclosure was not such a disposition as would trigger a commission." Good argument and respectable authority do not impress the majority, who are seemingly content to say that there would not be any obligation to pay a commission under this agreement if the Knudsons died or otherwise involuntarily lost the subject matter property by tax sale. The majority simply avoids com-

ing to grips with the word "dispose"—a case of first impression in this court. It is a word which does have attributable legal significance. *See* Black's Law Dictionary, p. 423; 27 C.J.S., pp. 593–99—with cases footnoted, all dealing with the legal significance of "dispose," "disposition," and "disposal."

## II.

The majority opinion in an equally summary manner holds that, if an alternate disposition is preferred, the judgment below can be affirmed because there was not a valid transfer of title during the term of the listing agreement, said to be so because the deed from the Knudsons to Batey, Inc., could not be a valid transfer because, though signed and mailed on May 26, it was not received until June 2 and could not have been accepted before that time, a theory which was advanced to the trial court, not ruled upon, but urged again here by the Knudsons. In *Blankenship*, the main authority relied upon by the majority, a misrepresenting Washington broker obtained for the Blankenships a deed for which they had never bargained, and purported to convey to them Washington property which they did not want to acquire. They did not accept the deed. They received the deed and rejected it and returned it with the signatures crossed out. 97 Idaho at 359, 367–68, 544 P.2d at 325–26. Although the opinion in that case was an admirable one, the holding as to acceptance does not readily adapt to this case where there is no question but that the deed was accepted and $5,000 paid for something. And, it is a fact that the negotiations for the deed took place *during* the existence of the listing agreement. The listing agreement contemplates the possibility of a "sale, trade, or other disposal of the property either within or without said time period," showing the likelihood that the parties did not understand that the Knudsons could avoid the obligation of their agreement to pay a commission if they did in fact during the term of the agreement commence negotiations which culminated in a sale one or more days after the termina-

tion. Certainly a valid oral agreement was reached before the deed was signed and mailed, and I can conceive of no way in which the Knudsons could have reneged after executing the deed and mailing it. *See Hoffman v. S.V. Company, Inc.*, 102 Idaho 187, 628 P.2d 218 (1981). Moreover, my perusal of the record discloses that in addition to the quit claim deed which was executed and acknowledged by the Knudsons, there was a Bargain and Sale Deed of February 1, 1980, lying in escrow, by which the Knudsons also reconveyed to their purchasers in the event of uncured default, per paragraph 8 of the original Contract of Sale under which the Knudsons became purchasers in possession. The apparent reason for the 1982 quit claim deed was that the 1980 Bargain and Sale Deed ran to the Dillons and the Bateys—rather than to Batey, Inc. The inconvenience of a second deed from the Dillons and Bateys to Batey, Inc. was thus avoided. The affidavit of John Insinger explains:

> After the contract was assigned to Batey, Inc., the Knudsons informed Batey, Inc. of their inability to comply with the terms of the contract. A notification of default was given to the Knudsons regarding the property at issue. When the Knudsons breached the contract of sale, the parties discussed the means by which a forfeiture proceeding over the disputed amount of the Knudson's landscaping and improvements could be avoided. To avoid the time and expense of that procedure, it was agreed that the Knudsons would execute a quitclaim deed in order to formally clear any interest of Knudsons from the public record, and transfer any purported, claimed or apparent interest of Knudsons back to Batey, Inc., the contract assignee, in lieu of forfeiture and any litigation.

R., Vol. 3, p. 4.

It seems to border on the absurd to speculate that Batey would not accept what it had agreed to as the lesser of evils; and then use that speculation as a predicate for saying that because Batey *might not have* accepted the deed, the acceptance of it one

day late was—per adventure—fatal to Smith, Inc.'s claim of a commission based on a contractual provision.

### III.

The unanswered question remains: Where the Knudsons apparently were in admitted uncured default, had possession of the property, and were claiming reimbursement for improvements, did the settlement of *that* dispute constitute a sale or other disposition within the provisions of the listing agreement? Mr. Insinger tells us that the $5,000 was paid to avoid the time and expense of a legal action. While it would appear to be a nominal amount indeed as compared to litigation, such still does not answer the underlying question which was briefed and argued. Where the majority has avoided the issue it would be an exercise in futility for one member of the Court to address it. Hence, I mention only that it does seem that if Smith, Inc. is entitled to a commission on the in-lieu-of foreclosure out-of-court settlement, it might be hardpressed to establish a selling price where there was not a sale, per se, but a compromised dispute of the Knudsons' unjust enrichment claim as per *Graves v. Cupic*, 75 Idaho 451, 272 P.2d 1020 (1954), and its progeny. The agreement provides for six percent *of the selling price*. This is also applicable to a *disposition* of the property, and at best, under that theory, Smith, Inc., might have to be content with six percent of that which was actually received by the Knudsons, assuming that they were indeed selling their equity in the property, as perhaps diminished in value by real estate trends but enhanced in value by their improvements.

Because the Court does not discuss or decide the issue which was presented, I am unable to concur and hence dissent. The case, one of first impression, was an important one. The opinion of the Court in my view does absolutely nothing toward clarifying this aspect of real estate law.

An important point to keep in mind is that the Knudsons were in default on the balloon payment, and their extension expired May 1, 1982. One month after receiving the extension, they signed the listing agreement, which would expire one month after the extension would expire. Presumably after the extension time ran out, the Knudsons had nothing to sell, except and other than their claim for restitution and threat of litigation.