753 P.2d 281

In the Matter of the ESTATE OF
Esther ASHE, aka Esther F.
Ashe, Deceased.

Sam ASHE, Plaintiff-Appellant,

v.

Jack HURT, Michael R. Hurt, Allen L.
Hurt, Brett W. Hurt, Adam L. Hurt,
Kevin L. Hurt, Timothy Hurt, Individu-
als, and James E. Schiller, In His Ca-
pacity As Personal Representative of
the Estate of Esther Ashe, Deceased,
Defendants–Respondents.

No. 16818.

Court of Appeals of Idaho.

April 1, 1988.

Petition for Review Granted June 9, 1988.

Merlyn W. Clark, Hawley, Troxell, Ennis & Hawley, Boise, for plaintiff-appellant.

Gary L. Morgan, Caldwell, for defendants-respondents.

SMITH, Judge Pro Tem.

This is an appeal from an order made in the administration of a decedent's estate, with respect to the inclusion, and exclusion, of certain property in the estate. The order was entered in the magistrate division in Owyhee County, in the estate of Esther Ashe, deceased. The petition of Sam Ashe, surviving husband of the decedent, to classify a Merrill–Lynch brokerage account as his separate property pursuant to a joint tenancy agreement, and to classify as community property an acreage in Idaho formerly shared with his wife, Esther Ashe, was denied by the magistrate. On appeal, Mr. Ashe asserts the magistrate applied an incorrect standard of proof to the question of joint tenancy. He also contends that as a matter of law a deed to the Idaho property was never delivered. We affirm.

Esther Ashe died on December 26, 1983. She left a surviving spouse, Sam Ashe; a son from a prior marriage, Jack Hurt; and Jack's sons and grandsons. After Jack Hurt was appointed as special administrator, he filed a petition for formal probate of the will of Esther Ashe, and for his appointment as personal representative. Sam Ashe objected, alleging that duress and mental incapacity of the decedent rendered the will invalid. That contest was resolved by a stipulation in which the will was admitted to probate, another person (James Schiller) was appointed as personal representative, and the contested issues were delineated.

Later, Sam Ashe filed a petition seeking an order declaring (1) that a cash management account at Merrill–Lynch, Boise, Idaho, was his property and was not to be included in the estate and (2) that a parcel of real property previously deeded to Jack Hurt was to be included in the estate as community property. Jack Hurt responded, petitioning for a determination that the Merrill–Lynch account was community property and that the real estate in question had been disposed of by the deed and therefore was not a part of the estate. Following trial before a magistrate, the court entered findings of fact and conclusions of law, and an order denying Sam's petition and granting Hurt's petition. The magistrate's decision was affirmed on appeal to the district court.

I

BACKGROUND

The facts leading to the controversy in this case are not materially in dispute. Sam and Esther were married in Santa Rosa, California, in 1938. Esther's son by a prior marriage, Jack Hurt, was then about fourteen years of age. He lived with Sam and Esther for about four years after the marriage. Sam and Esther had no children during their marriage.

Sam and Esther accumulated considerable wealth during their marriage. Sam "bucked" the oil fields for a few years and then started speculating in houses, buying and building in Bakersfield, California and the environs. They each inherited some assets from their respective families. Sam gave real estate he inherited to his family members. Securities inherited by Esther in 1960 in the amount of about $19,000 were either sold or reinvested by the couple. Esther was an osteopath, but apparently did not practice her profession. Accordingly, it is apparent from the record that the wealth of Sam and Esther came from Sam's expertise as a speculative builder, from their investments and from the construction business.

The couple established a joint tenancy stock brokerage account at the E.F. Hutton office in Bakersfield in 1963. According to Mr. Ashe's testimony, after Esther had attended a businesswomen's meeting, she took Sam to confer with an investment advisor who had aroused her interest in the manner of making investments. Sam recalled that the investment advisor told them there were two ways to avoid inheritance taxes, i.e., to give the property away or to spend it. The investment advisor also

talked to Sam and Esther about holding property in joint tenancy with right of survivorship.

As a result of this advice and other contacts, Sam deduced that in joint tenancy with right of survivorship, two people own the property, and if one survives the other, the survivor takes the ownership of the total property. He also understood that one cannot "will away" property that is held in joint tenancy.

Thus, according to Sam's understanding of the meaning of joint tenancy, Sam and Esther accumulated their wealth in joint tenancy with right of survivorship. However, the evidence does not clearly establish whether Esther fully understood all of the ramifications of joint tenancy with right of survivorship. It does appear that Esther for years incorrectly believed that a married person could not make a will at all without the consent of the other spouse. So from time to time during the marriage, Esther asked Sam about making a will. Sam would respond "lets get together and see what we want." However, they never did get together in the making of a will.

At some time just prior to 1972, Sam became interested in residing in Idaho. In 1972 and 1973, he and Esther liquidated their real estate holdings in California and moved to the vicinity of Marsing, Idaho. The E.F. Hutton brokerage account was left in California. They acquired a home and acreage in the Marsing area which came to be known to them as the "Home Place."

While Sam and Esther lived in the Marsing area, they met people, made friends and became a part of the community. Esther continued to be concerned about the disposition of their estate, as was Sam. In April of 1981, Sam gave some Owyhee County lots to his brother, Tillman Ashe. Esther reluctantly joined in this conveyance. That same month, Sam joined with Esther in deeding the Home Place to Esther and Jack. The deed was delivered to Esther by Sam with the admonition that the deed should not be recorded. Jack was not told about this deed at that time. Sam and Esther contemplated they would have the use of the Home Place so long as they needed it. However, no language reserving a life estate was contained in this deed. Jack did not become aware of this deed until October, 1981.

In May, 1981, Jack Hurt moved from Arkansas to Idaho. Jack testified that his mother had invited him to move to Marsing. Sam testified that, prior to this move, Esther asked Sam if he wanted Jack and Ina, Jack's wife, to move to Marsing. Sam did not want them to move to Idaho, but the next thing he knew they had moved in. Actually, Jack and Ina lived in Ina's travel trailer parked on the Home Place. After that Sam felt like a stranger in his own home. Following Jack and Ina's move onto the property, all of the parties were living "pretty close" together and, according to Sam, Jack was showing his mother great "familial" affection for the first time. It is clear from Sam's deposition that he thought Jack was trying to ingratiate himself, particularly with Esther, in order to gain from the newly "cultivated" close relationship.

Later in September, 1981, because of the way Jack was acting, Sam felt uncomfortable. He decided to take a trip to Europe. He stayed about thirty days. He then returned to the United States having decided not to return home to Marsing. Sam was concerned Esther might cash out the brokerage account in California and "leave him in the cold." He decided to take the money himself. He cashed in the E.F. Hutton account, and obtained $329,000 in checks. He then returned to Marsing, found $28,000 in his bank account there, put $4,000 with it, obtained cashier's checks amounting to $325,000 and took the cashier's checks with him to San Francisco where he opened a new brokerage account in his own name with Merrill–Lynch. The cashier's checks, two in number, were dated October 29, 1981. The Merrill–Lynch account was established on or about the next business day.

On October 30, 1981, Esther and Jack consulted with an attorney, Terry Coffin. Esther had learned that Sam was back from Europe and that he had cashed in the

E.F. Hutton account. She also was concerned about the state of Sam's health. She had heard he was ill. She believed Sam was going to take the money to Arden Woods Benevolent Society in San Francisco and use those funds to acquire a place to live for the rest of his life. She wanted Terry Coffin to make sure her share of the money was protected. After discussing several possibilities, Coffin recommended divorce proceedings be filed so she could obtain a restraining order to tie up the money.

On November 2, 1981, the divorce action was filed. Also, the deed of the Home Place to Jack and Esther was recorded. About the same time, David Stecher, another attorney in the same firm with Terry Coffin, was instructed by Esther to prepare a will for her. She executed the will on November 5, 1981. The will gave all of her property to Jack, his children and his grandchildren. This will was the one later admitted, by stipulation, to probate in this case.

Toward the latter part of November, 1981, Sam returned to Marsing to contest the divorce or at least the settlement thereon. While in Marsing Sam and Esther reconciled at the urging of a friend, John Larsen.

In January, 1982, while Sam and Esther were traveling in California, they went to San Francisco where Sam transferred the Merrill–Lynch account to himself and Esther as joint tenants with right of survivorship. Sam and Esther were still residing at the Home Place in Marsing. In March, 1982, the Merrill–Lynch account in San Francisco was transferred to Merrill–Lynch in Boise, Idaho. Brokers James Steele and Louise Schneider discussed joint tenancies with the Ashes. The Boise account was set up in the same manner as was accomplished previously for the California account.

Then, on June 21, 1982, the Home Place (which earlier had been deeded to Jack and Esther outright) was again transferred so as to make them joint tenants with right of survivorship. The mechanics of this involved conveyances by Jack and Esther to attorney Stecher, as a straw man, who then reconveyed the Home Place to Jack and Esther as joint tenants with right of survivorship.

In late 1982, Sam and Esther again travelled to California. They stayed in Santa Barbara for about a year, visited in Bakersfield and attended a summer educational session in St. Louis, Missouri, returning to Marsing in 1983. Esther died in December. The proceedings in the courts below then began.

The findings of fact and conclusions of law entered by the magistrate included procedural facts, general facts, ultimate facts and conclusions of law. The "Conclusions of Law," essentially state as follows:

1. The law of Idaho applied.

2. In reference to the Merrill–Lynch account, Sam Ashe had the burden to prove by clear and convincing evidence that Esther Ashe intended the creation of a joint tenancy with right of survivorship; that Sam Ashe did not meet that burden of proof; that therefore the account did not pass to Sam Ashe by right of survivorship but in fact passed under the last will and testament of Esther Ashe.

3. The deeds on the Home Place transferred that property to Jack Hurt, as the survivor of the joint tenancy created by the deeds.

4. The burden of proof was not met by the petitioner, Sam Ashe, to set aside the deeds, and the real estate at the time of the death of Esther Ashe was not community property.

As stated, the magistrate made an order based on his findings and conclusions. On appeal, the district court concluded there was sufficient evidence in the record of the case to affirm the findings and legal conclusions of the magistrate.

II

ISSUES

On his appeal to this Court, Sam Ashe presents the following issues and contentions:

1. (a) Whether, with regard to the stock brokerage account, the magistrate erred in requiring that joint tenancy with right of survivorship be proved by clear and convincing evidence. Ashe contends the magistrate erred in this respect because the Ashes originally maintained the brokerage account in California and therefore California law and not Idaho law is applicable to the account.

(b) Whether the magistrate erred in applying the presumption of community property to the account, thereby requiring proof by clear and convincing evidence that the account was held by the Ashes in joint tenancy with right of survivorship. Ashe claims that the adoption of Idaho Rule of Evidence 301 has modified that judicially created presumption.

(c) Whether the magistrate's finding that Esther did not intend to create a joint tenancy in the brokerage account was supported by substantial, competent evidence. Ashe contends the evidence indicated clearly that Esther understood the effect of a joint tenancy and the finding of a lack of intent was therefore not supported by the evidence.

2. With respect to the Home Place, whether the magistrate erred in concluding that an effective delivery of the deed occurred when Sam and Esther deeded the Home Place to Esther and Jack while Jack had no knowledge of the execution of the deed.

### III

### DISCUSSION

The standard of review applicable to this case is well settled. First, the findings of the trier of the facts will not be disturbed if these findings are supported by substantial, competent, although conflicting evidence. *Rueth v. State*, 103 Idaho 74, 644 P.2d 1333 (1982); *Ustick v. Ustick*, 104 Idaho 215, 657 P.2d 1083 (Ct.App.1983). Second, we must determine whether the magistrate's conclusions of law follow from the findings of fact. *Nicholls v. Blaser*, 102 Idaho 559, 633 P.2d 1137 (1981); *Griffin v. Griffin*, 102 Idaho 858, 642 P.2d 949

(Ct.App.1982). Finally, if those findings are so supported and the conclusions follow therefrom, and if correct legal principles have been applied, then the district court's decision affirming the magistrate's judgment will be upheld on further appeal. *Ustick, supra.*

### A

With regard to the brokerage account, Mr. Ashe contends that California law should be applied in determining the joint tenancy status of the account. He submits that he is not attempting to apply California law to determine the joint tenancy status of the Merrill–Lynch account *after* it was transferred to Idaho. He maintains, however, that California law does determine the joint tenancy status of the account while the account was located in California. He argues that Idaho cases hold the status of property—acquired in other states by parties who later moved to Idaho—is not altered by applying Idaho law to the property acquired in other states. *Berle v. Berle*, 97 Idaho 452, 546 P.2d 407 (1976); *Douglas v. Douglas*, 22 Idaho 336, 125 P. 796 (1912).

The *Douglas* case recognized the well-established rule that personal property acquired during coverture is controlled by the law of the marital domicile. However, as Mr. Ashe correctly points out, the case also holds that where a spouse held property in another state as separate property, the mere crossing of state lines into Idaho does not change the character of the property from separate to community. The rule applies generally to personal property as well.

On the other hand, I.C. § 55–401 provides:

> If there is no law to the contrary in the place where personal property is situated, it is deemed to follow the person of its owner and is governed by the law of his domicil.

In addition, it has been held that the disposition of personal property is controlled by the law of the domicile of the owner at the time of his death without regard to where the property was located or where the own-

er died. *Vansickle v. Hazeltine*, 29 Idaho 228, 158 P. 326 (1916).

Mr. Ashe contends the *Douglas* case makes the law of California applicable to the brokerage account because Sam and Esther did not transfer this account to Idaho when they moved to Idaho in 1972. Additionally, he tells us the critical time to examine is March, 1982, just before the joint tenancy brokerage account was transferred from Merrill–Lynch, San Francisco, to Merrill–Lynch, Boise. Ashe contends at that time California law rather than Idaho law determined the status of the joint property account. We disagree.

The action of Sam when he returned from Europe in late October, 1981, is a crucial fact in the case. At that time, he terminated the E.F. Hutton account, and placed all of the proceeds in his own name in a Merrill–Lynch account. Any act of a joint tenant which destroys one or more of its necessary co-existent unities of interest, time, title and possession operates as a severance of the joint tenancy and extinguishes the right of survivorship; the act of one joint tenant in severing his interest in the property severs the joint tenancy, thereby terminating the joint tenancy. *Ogilvie v. Idaho Bank and Trust Co.*, 99 Idaho 361, 582 P.2d 215 (1978); 20 AM. JUR.2d *Cotenancy and Joint Ownership* § 16 (1965). Thus, when Sam cashed out the E.F. Hutton account, he terminated the joint tenancy. But when Sam and Esther reconciled in December, 1981, and reestablished the brokerage account in January of 1982, in San Francisco, they were domiciled in Idaho.

It is well settled that personal property acquired during coverture is governed and controlled by the law of the marital domicile. *See* 2 RESTATEMENT (SECOND) OF CONFLICTS OF LAWS § 258 (1969). Moveables have no situs; instead they "accompany" the person everywhere. *See Douglas v. Douglas, supra; Vansickle v. Hazeltine, supra;* I.C. § 55–401. *Cf.* 2 RE-STATEMENT (SECOND) OF CONFLICTS OF LAWS § 259 (1969). Therefore, we conclude that, since Sam and Esther were domiciled in Idaho at the time the Merrill–Lynch brokerage account was created in California as a joint tenancy account, the magistrate was correct in deciding to apply the law of Idaho.

B

Mr. Ashe acknowledges the rule that a survivor of a joint account is required to show by clear and convincing evidence the deceased party to the account intended that the corpus of the account pass to the survivor by right of survivorship. *See In re Estate of Bogert*, 96 Idaho 522, 531 P.2d 1167 (1975). However, Ashe contends that adoption of I.R.E. 301 has changed the *Bogert* ruling.[1]

Idaho Evidence Rule 301, effective July 1, 1985, provides:

In all civil actions and proceedings not otherwise provided for by statute or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, *which remains throughout the trial upon the party on whom it was originally cast.* [Emphasis added.]

Ashe contends that—in order to overcome the presumption of community property—the survivor to the joint tenancy account must only go forward with evidence to rebut or to meet the presumption and that once such evidence is presented the presumption disappears. We disagree. The rule in *Bogert* casts the risk of nonpersuasion on the survivor to the account, which risk—as provided by Rule 301—remains throughout the trial upon whom "it" (the burden of nonpersuasion) was originally cast. Therefore, we hold the magistrate did not err in requiring proof by clear and convincing evidence that Esther intended

---

1. Arguably we may not be obliged to decide whether I.R.E. 301 altered the *Bogert* rule, since it does not appear that inquiry was presented to any court below. However, since no objection to the consideration of this subject has been presented and the query appears to be encompassed by the issues we must resolve in this case, we will address the question.

the creation of a joint tenancy with right of survivorship on the Merrill–Lynch account.

## C

We turn next to the magistrate's finding that Esther did not intend to create a joint tenancy with respect to the brokerage account. Ashe contends there was not substantial and competent evidence produced at trial to support that finding. He maintains there was uncontradicted evidence by three disinterested witnesses who said they had explained to Esther and she understood the effect of a joint tenancy with right of survivorship. We disagree with Ashe's position. The magistrate did not find Esther lacked the intent. Instead, the magistrate held that Ashe had failed to carry his burden to show the existence of such an intent.

Ashe has cited *Kreiensieck v. Cook*, 108 Idaho 657, 660, 701 P.2d 277, 280 (Ct.App. 1985), for this rule:

When a trial court finds facts that must be established by clear and convincing evidence, the question on appeal remains whether the findings are supported by substantial and competent evidence.

■ As applied to this case, the rule placed the burden on Ashe to prove by clear and convincing evidence Esther intended to create a joint tenancy account. The magistrate made his findings on the basis he was not convinced by Ashe's evidence that Esther intended to create a joint tenancy when Sam and Esther travelled to San Francisco in 1981 after they reconciled. It is not required that there be evidence on which the magistrate must rely to find that Esther did not intend the creation of a joint tenancy. Rather, in finding no joint tenancy was created, the magistrate may—even

in the face of uncontroverted evidence to the contrary—rely on the presumption favoring community property in finding no joint tenancy was created. *See In re Estate of Bogert, supra; Idaho First National Bank v. First National Bank of Caldwell,* 81 Idaho 285, 340 P.2d 1094 (1959); *Fredricksen v. Fullmer,* 74 Idaho 164, 258 P.2d 1155 (1953).[2]

■ In any event, Ashe is not correct in his assertion that the evidence was uncontroverted on the issue of whether Esther intended and understood the effect of joint tenancy with right of survivorship. The record describes instances where Esther merely acquiesced in events which were taking place. The stockbrokers' testimony on which Ashe relies disclosed the brokers did not inquire into Esther's intentions. The testimony of her friend, Betty Ashe, and others indicated Esther always intended to maintain her one-half interest in the joint account. For example, Esther's reluctant filing of a divorce was undertaken to protect and preserve her one-half interest in the brokerage account.

The *Bogert* case, *supra,* is factually similar and on point with this case. In *Bogert,* the Idaho Supreme Court held:

(1) Spouses can transmute community property into joint tenancy in the state of Idaho, with right of survivorship, but the intention to so transmute the property must be shown by clear and convincing evidence.

(2) When spouses attempt to transmute community property to property owned by joint tenancy, each thus makes a gift to the other of his or her interest in the community property, including the right to devise one-half of the community property at

2. We have not found any authority explicitly holding that a trial court may rely upon the community property or a status quo presumption in the face of uncontroverted evidence of an intent to transmute property to separate property status. However, given the heavy burden on the proponent of transmutation, such a rule appears to be consistent with prior cases. *See, e.g., Griffin v. Griffin,* 102 Idaho 858, 642 P.2d 949 (Ct.App.1982) (signature on loan application supportive of transmutation intent, but not conclusive—finding of no transmutation af-

firmed despite no contrary evidence); *Hooker v. Hooker,* 95 Idaho 518, 511 P.2d 800 (1972) (first reported Idaho transmutation case—"isolated testimony" was sufficient to create "substantial conflict" in evidence upon which trial court could find no intent to transmute).

Our decision rests on the theory that the trial judge must be "convinced" by the evidence, the burden is not simply one of going forward ("production"). Here the judge was not convinced, i.e., Ashe did not meet his burden of persuasion.

death, and in return receives as a gift a separate property interest in joint tenancy. The intent of a party to a joint account to have made an inter vivos gift must be proved by clear and convincing evidence.

(3) The decedent's intention to make a gift must be demonstrated by a quantum of proof greater than a preponderance of the evidence, i.e., an intent to make such a gift clearly and unequivocally.

(4) Whether a clear and convincing burden of proof has been met is a question for the trier of fact to decide.

It is not clear from the record that Esther intended a gift to Sam of her interest in the account. Instead, consistent with the magistrate's determination, it appears the basic intent of Sam and Esther in creating the joint account was an ill-advised attempt to avoid probate and not the making of gifts to each other. Accordingly, the decision of the magistrate that Sam had not met his burden of proof must be affirmed as to the Merrill–Lynch account.[3]

### D

[5] We turn next to the conveyance of the Home Place by Sam and Esther to Esther and Jack in April, 1981. Ashe asserts the magistrate erred in reaching the following finding and conclusion:

Sam and Esther executed a deed ... conveying the property to Esther and Jack as grantees. The court finds that was a voluntary act and that Sam "did it to make her happy." The Court finds a valid consideration was given—that Sam had previously conveyed real estate to his brother and nephews. Secondly, the Court further finds that the delivery of the warranty deed to one of the grantees constituted delivery to both grantees. The Court concludes that the burden of proof to set aside the conveyance has not been sustained.

The magistrate held that Ashe had made an effective gift of the Home Place. The respondents cite *Matter of the Estate of Lewis*, 97 Idaho 299, 543 P.2d 852 (1975), in

support of the magistrate's determination. In *Lewis*, the Idaho Supreme Court held there are five elements to an enforceable gift during lifetime: (1) a donor competent to contract; (2) freedom of will of the donor; (3) the gift must be complete and nothing left undone; (4) the property must be delivered by the donor and accepted by the donee; and (5) the gift must go into immediate and absolute effect.

On this appeal, Ashe focuses on the element of required delivery, number 4 above. He cites the rule regarding delivery as expressed in *In re Estate of Courtright*, 99 Idaho 575, 579–580, 586 P.2d 265, 269–270 (1978):

This Court has consistently held that in order for a deed to be adequately delivered it must be voluntarily "surrendered" by the grantor, with an intent to pass immediate and present title. This intent is indispensable to valid delivery.... [T]he real test of the delivery of a deed is this: Did the grantor by his acts or words, or both, intend to divest himself of title? If so the deed is delivered. [Citations omitted.]

Mr. Ashe contends the "delivery" was ineffective in this case because neither Sam nor Esther intended to divest themselves of the property until death. He cites *Claunch v. Whyte*, 73 Idaho 243, 248, 249 P.2d 915, 917 (1952), for the proposition that:

Manual delivery of a deed by the grantor to the grantee with the understanding that it is not to become effective until death of the grantor is not such a delivery as will pass the title.

Ashe argues that, even if delivery to Esther constituted delivery to Hurt, such delivery was ineffective because it was understood title would not pass until the death of the grantors. He asserts, moreover, that there is no evidence Jack Hurt authorized Esther to accept a delivery of the deed for him. Hurt did not even know about the deed. Ashe relies upon *Blankenship v.*

---

**3.** We readily recognize that if the burden of proof in this case had been less than "by clear and convincing evidence," (for example, by a simple preponderance of the evidence) the result in this case could have been entirely different.

*Myers*, 97 Idaho 356, 544 P.2d 314 (1975), for the proposition that a "delivery" involves a meeting of the minds, a surrender and an acceptance of the instrument.

■ On the other hand, the respondents focus on the "present donative intent" as a necessary element of an enforceable gift. They argue that the controlling factor is the giver's purpose or motive to transfer immediately to the donee dominion over the object given. Such transfer need not necessarily be to the donee in person. It may be to a third-party agent acting in the donee's behalf. 23 AM.JUR.2d *Deeds* §§ 139, 144 (1983). The delivery of a deed to a third party for the benefit of another has been upheld by our Supreme Court. *In re Estate of Lewis, supra; see also Boston Insurance Co. v. Beckett,* 91 Idaho 220, 419 P.2d 475 (1966). Or, if there are several grantees as cotenants or as holders of present and future interests, delivery to only one of them is sufficient. *See Belli v. Bonavia,* 167 Cal.App.2d 275, 334 P.2d 196 (1959); R. CUNNINGHAM, W. STOEBUCK, AND D. WHITMAN, THE LAW OF PROPERTY § 11–3, p. 736 (1984).[4]

It is clear from the record that Sam was competent to make a gift and to exercise his free will. There is evidence that Sam intended a present gift of the Home Place to Esther and Jack. It was Sam who contacted his friend John Larsen with the request that Larsen prepare the deed. Larsen was puzzled about the request. He knew Sam had no abiding love for Jack; but, according to Larsen, Sam "implied that it was to make Esther happy." Esther apparently was distressed because Sam had talked her into joining in making a gift of real estate to Sam's brother, Tillman. Sam told Esther's friend, Betty Ashe, the

same thing. Sam knew about life estates. He did not create or retain any life estate in the deed to Esther and Jack. Sam had transferred property to his nephews. Clearly, the deed to Esther and Jack was *quid pro quo*, to make things right with Esther.

Thus, as to Esther, all of the elements of a gift were complete. Sam was competent to contract, he possessed free will, the deed was made and delivered to Esther—the gift to her was complete. She accepted the deed and it was intended to go into immediate effect. There could hardly be doubt about this.

Likewise, no one could doubt that Esther intended to grant an interest to Jack. Her statement to the effect that she hoped Jack would allow her to manage the premises recognizes an ownership interest in Jack and naysays any intent on her part that the deed was to take effect at death.

The evidence does not support Sam Ashe's position that the deed from him and Esther to her and Jack was to be effective only at Sam's death. By the warranty deed in question, Esther did not divest herself of any interest. The deed as to Esther merely converted the community property interest of Sam into a separate property interest in Esther and Jack. After that deed was delivered to Esther, her interest—a separate interest—would be available for testamentary disposition.

As the magistrate determined, Sam intended to make the conveyance, and the deed was delivered to and accepted by Esther. Upon the record of this case, the delivery of the deed to Esther constituted a delivery to Jack as well. Esther thought

---

**4.** While the rule apparently has not been propounded in Idaho, there appears to be little doubt that delivery to one cograntee is sufficient delivery to all. *E.g., Belli v. Bonavia, supra* 334 P.2d at 199–200 ("The fact that one of the grantees has no knowledge of the deed or intent to pass present title, has no bearing on the grantor's intent to divest himself of title. Delivery to one joint owner is delivery to both. Acceptance is presumed where a grant is beneficial, even where a grantee has no knowledge of the deed." [Citations omitted.] ); *Eshelman v. Henrietta Vineyard Co.,* 102 Cal. 199, 36 P. 579 (1894);

*Perkins v. Kerby,* 308 So.2d 914 (Miss.1975); *Lemon v. Madden,* 205 Or. 107, 284 P.2d 1037 (1955) (partition among heirs where three parties took jointly but one did not physically receive deed—held sufficient delivery); *Controlled Receivables, Inc. v. Harman,* 413 P.2d 807 (Utah 1966); 23 AM.JUR.2d *Deeds* § 140 (1983).

The *Belli* opinion best sets forth the foundation of this rule. Delivery to one grantee is evidence of intent to give up present dominion over the property; and, since acceptance is presumed, the present knowledge of all grantees is not required.

she was acting in Jack's behalf in procuring the deed and accepting it. As a cograntee, Jack's actual knowledge of the conveyance was not required. To act in Jack's behalf, Esther did not need to have express authority from him to accept the delivery of a deed for him. Therefore, we agree that the magistrate reached the correct conclusion in finding the Home Place was validly conveyed to Esther and Jack.

## IV

### ATTORNEY FEES ON APPEAL

The only issue remaining in the case is the matter of attorney fees on appeal. The respondents have claimed entitlement to attorney fees pursuant to Idaho Appellate Rule 41 and I.C. § 12–121. The respondents claim the appeal was brought without foundation and therefore, they are entitled to attorney fees on the appeal. We disagree. The issues presented by the appellant were entirely justified under the circumstances of this case. We award no attorney fees on this appeal. *Minich v. Gem State Developers, Inc.*, 99 Idaho 911, 591 P.2d 1078 (1979).

The decision of the district court, upholding the order of the magistrate division, is affirmed. Costs to respondents.

WALTERS, C.J., concurs.

SWANSTROM, Judge, specially concurring.

I concur in the opinion fully except as to part III C holding that Sam Ashe had no survivorship rights in the joint tenancy account established by Mr. and Mrs. Ashe in Idaho. As to part III C, I concur in the result. I believe that the magistrate correctly applied Idaho law to reach the result he did. Nevertheless, the *Bogert* rule's effect in this case is to give a decided advantage to one of two claimants to a decedent's property. It makes little sense here for one claimant to have the advantage of a presumption that the other claimant can only overcome by clear and convincing evidence. The *Bogert* rule has tilted the scales of justice too far in one di-

rection. Unfortunately, we are constrained to follow the rule.